Becker, Respondent, vs. Becker, Appellant.

*March 15—April 8, 1913.*

*Divorce: Alimony: Marriage: What constitutes: Validity.*

1. If there has been no marriage there can be no alimony.
2. An oral contract of marriage made between competent parties *per verba de præsenti*, although without witness or ceremony of any kind, if consummated by cohabitation and corroborated by holding themselves out to the public as husband and wife, is a valid and binding marriage.

APPEAL from a judgment of the circuit court for Milwaukee county: F. C. ESCHWEILER, Circuit Judge. *Affirmed.*

For the appellant there was a brief by *Rubin & Zabel,* attorneys, and *Horace B. Walmsley,* of counsel, and oral argument by *Mr. W. B. Rubin* and *Mr. Walmsley.*

For the respondent the cause was submitted on the brief of *Julius E. Roehr.*

TIMLIN, J. The respondent had a judgment for divorce and alimony against the appellant in the circuit court, and upon this appeal appellant raises the point that there was no marriage. The circuit court upon sufficient evidence found:

"That on or about August 15, 1898, at Milwaukee, Wisconsin, the plaintiff and the defendant agreed to take one another as husband and wife, and lawfully became husband and wife, and subsequently and from the time of the making of such contract and up to about the 10th day of May, 1911, the plaintiff and the defendant lived and cohabited together and were known in the community in which they lived, in the city of Milwaukee, in the state of Wisconsin, as husband and wife, and during said time the defendant at all times represented and held out that the plaintiff was his wife, and the plaintiff represented and held out that the defendant was her husband."

This, we take it, fairly means that an oral contract of marriage, *per verba de præsenti,* was made between the parties and consummated by cohabitation and corroborated by holding themselves out to the public as husband and wife. No question of the competency of the parties is made. The appeal fairly raises the question of the validity of such marriage, because if there was no marriage there could not be alimony. 2 Bishop, Mar., Div. & Sep. § 855, and cases cited. This is in harmony with our statute law, wherein sec. 2361 provides for support of the wife or minor children and suit money during the pendency of an action for annulment of marriage, while alimony is authorized only in actions for di-

vorce. Sec. 2364. The causes for which an action to annul the marriage may be brought are specified in sec. 2351, and cover void as well as voidable marriages, but no annulment suit is authorized by statute upon the ground of failure to obtain a marriage license or to solemnize or celebrate the marriage before a civil officer or a clergyman as required by secs. 2331 to 2339*g*. The question whether there may be in this state a marriage legally valid and binding, when resting only upon an oral agreement, entered into by competent parties without witness or ceremony of any kind, to then take each other for husband and wife, consummated by cohabitation and by holding themselves out to the public as married, has never heretofore been directly presented to this court for decision.

In *Martin v. Ryan,* 2 Pin. 24, one sued for an ante-nuptial, debt of his alleged wife attempted to escape liability on the ground that the person who officiated at the alleged marriage as a minister of the gospel had not filed his credentials of ordination as required by statute. Among other reasons for holding this plea insufficient the court said, *arguendo,* that after the ceremony the parties thereunto lived together as man and wife and Martin had recognized the woman as his wife before the world. There was in this case a ceremony.

*Williams v. Williams,* 46 Wis. 464, 1 N. W. 98, was an action brought to recover dower, the plaintiff resting her right upon the claim that she was the widow of one Williams. There was a formal or ceremonial marriage contract between the plaintiff and said Williams on May 9, 1870, but this was alleged to be void because plaintiff was at the time the lawful wife of one Jones, from whom she had been divorced by a judgment of the circuit court for Kenosha county in November, 1870. The plaintiff contended that this decree of divorce did not conclusively establish that she had ever been lawfully married to Jones, and that in fact she had not because Jones had a lawful wife living at the time plaintiff was

married to him and who was still living. These were apparently all formal or ceremonial marriages, but in answer to a contention of the plaintiff's counsel that a valid marriage should be presumed to have taken place between the plaintiff and Williams after she secured the divorce from Jones, and in declining to so hold because the relations between the plaintiff and Jones were hypothetically unlawful and meretricious, the court said:

"The law of this state declares that marriage is a civil contract (sec. 2328, R. S. 1878); and there is no statute law which points out in what manner the contract must be entered into to render it valid. It need not be in writing or in the presence of witnesses, but there must be an agreement between the parties that they will hold toward each other the relation of husband and wife, with all the responsibilities and duties which the law attaches to such relation, otherwise there can be no lawful marriage."

This case came up again in 63 Wis. 58, 23 N. W. 110, where it was ruled that the divorce judgment did not estop the plaintiff from showing she was never legally married to Jones because at the time of her supposed marriage to him he had a wife living, hence that she was entitled to dower as the lawful wife of Williams.

In *Spencer v. Pollock*, 83 Wis. 215, 53 N. W. 490, there was a proceeding to determine the descent of lands and a claim that the deceased owner left surviving him a widow. The finding of the circuit court was to the effect that the relations between deceased and this claimant were meretricious in their inception, and this decision was affirmed. True, it is rather assumed that no ceremonial marriage was requisite, this court saying after referring to the testimony: "From this testimony it is claimed that a common-law marriage is proven." A decision that there was no valid marriage at common law or otherwise does not expressly cover the question here presented.

In *Thompson v. Nims*, 83 Wis. 261, 53 N. W. 502, there

was an appeal from a judgment of the circuit court adjudg-
ing Julia L. Nims, since deceased, to be the widow and only
heir at law of one Thompson, deceased intestate.    It was
shown that the claimant and Thompson left the house of her
father and mother, apparently with the full knowledge and
consent of the latter, with household goods, declaring that
they were to be married.    They stopped that day at a hotel,
and after arriving there Thompson went out and returned
with a person whom the claimant believed was a minister.
The court did not allow claimant to testify as to what further
took place with reference to the marriage contract and no
other witness was produced.    She further testified that this
person remained in the room about half an hour, that after
that time she had always borne the name of Mrs. Thompson,
and that she and Thompson lived together and held them-
selves forth as husband and wife.    This testimony tended to
prove that some ceremony of marriage took place before a
person thought to be a clergyman.    It was sufficient to sup-
port the judgment below.    This court in the opinion repeated
what was said in *Williams v. Williams,* 46 Wis. 464, 1 N. W.
98, and went further:

"This agreement is a fact to be proven.    It may be proven
by circumstantial evidence as many other facts are proven.
In this case there is no direct evidence that these parties
promised to assume the relations of husband and wife, but
the circumstances proven seem to us very persuasive and to
justify the finding that there was a marriage in fact."

In *Lanham v. Lanham,* 136 Wis. 360, 117 N. W. 787,
there was an application by the woman for her support out of
the estate of one Lanham, deceased, based on the claim that
she was the widow of said deceased.    She was married to the
deceased by ceremony before a justice of the peace at Me-
nominee, Michigan, and returned with Lanham to Wisconsin
to reside.    The parties immediately assumed the relations of
husband and wife and lived and cohabited together until Lan-

ham's death. This marriage was within one year from the date of her divorce from one Sherman and forbidden by statute, and it was held invalid. The marriage was further attempted to be upheld on the ground that there was a common-law marriage resulting from the fact that the parties lived and cohabited together as husband and wife for about six months after the expiration of the year and after her disability to contract marriage had ended. This court, assuming apparently that there could be such a thing as a valid "common-law marriage," held the evidence insufficient to establish that form of marriage.

In *Severa v. Beranak,* 138 Wis. 144, 119 N. W. 814, the question came up with reference to a marriage contracted within a year after divorce and therefore invalid. The court below held there was a common-law marriage between the parties. This decision was reversed, this court saying: "The conclusion that there was a common-law marriage between the parties under the facts aforesaid cannot be upheld."

These decisions clearly indicate that the judges of this court understood that a valid marriage contract could be made by mere private oral agreement between parties competent, if consummated by cohabitation as husband and wife and corroborated by holding themselves forth to the public as married. The same status grew out of a contract so made, performed, and corroborated as resulted from a formal or public solemnization of the contract before an officer or a clergyman; and the statutes on the subject have not since been changed in any respect material to this question. It may not be out of place, however, for me to notice the law on this subject elsewhere.

In Kent's Commentaries, which has stood for a long time as a reliable text-book on American law, it is said:

"If the contract be made *per verba de præsenti,* and remains without cohabitation, or if made *per verba de futuro,* and be followed by consummation, it amounts to a valid mar-

riage in the absence of all civil regulations to the contrary, and which the parties (being competent as to age and consent) cannot dissolve, and it is equally binding as if made *in facie ecclesiæ.*" 2 Kent, Comm. (14th ed.) p. 87.

That part of this sentence relating to contracts for the future has been disapproved in *Cheney v. Arnold,* 15 N. Y. 345, and in other cases. The law as determined by the instant case is affirmatively stated as applied to the facts before the court and much narrower than the foregoing quotation. It is unnecessary to negative questions not argued and not before the court on this appeal. Whether such a marriage would be upheld where there was no consummation by cohabitation or corroboration by holding themselves out as married, we are not called upon to decide. Blackstone states the law on this subject more cautiously as follows:

"Any contract made, *per verba de præsenti,* or in words of the present tense, and in case of cohabitation *per verba de futuro* also, between persons able to contract, was before the late act deemed a valid marriage to many purposes; and the parties might be compelled in the spiritual courts to celebrate it *in facie ecclesiæ.* But these verbal contracts are now of no force to compel a future marriage. Neither is any marriage at present valid that is not celebrated in some parish-church or public chapel, unless by dispensation from the archbishop of Canterbury." 1 Bl. Comm. ch. 15, p. 439.

For an instance where the parties to an informal or irregular marriage contract were cited before the ecclesiastical court and required to have a regular marriage ceremony performed, see *Baxtar v. Buckley,* 1 Lee, Eccl. Cas. 42. It would be impractical to review the great number of cases in the courts of this country upon this point. They are well summed up and the cases collected in 26 Cyc. 837, 838, note 59, Id. 840, and note 74, and reach back to a very early period in our history.

"In pursuance of the rules just stated, and of the statutes in many states declaring marriage to be a civil contract, it is held that a valid common-law marriage may be constituted by

a mutual agreement between two parties who are both capable of entering into marriage, and as to whom no impediments exist, whereby they presently undertake and contract to become husband and wife and mutually promise to continue that relation permanently, and thereupon assume their marital duties and cohabit together."

"Statutes requiring marriages to be solemnized in a particular manner or before certain authorized persons or under a license, although they may impose penalties for nonobservance, are generally construed as directory only, in so far as this, that a marriage valid at common law, but not celebrated in accordance with the requirements of the statute, will be held valid and binding, unless expressly declared void by the statute." Ibid. 840.

After these American courts had become committed to this view of the "common law," the highest court of England in the year 1844, in *Queen v. Millis,* 10 Cl. & F. 534, by an equal division, affirming an equal division below, decided against the existence of any such rule in the common law of that country. This was followed in *Beamish v. Beamish,* 9 H. L. Cas. 274, and it is now established as the rule of the common law in the place of the origin of that law. These cases are severely criticised by Mr. Bishop (1 Bishop, Mar., Div. & Sep. §§ 400 to 422), where the position of the courts of Massachusetts, Maryland, and Maine on this question is also referred to.

In *Milford v. Worcester,* 7 Mass. 48 (1810), a marriage by oral agreement of the parties, although consummated, was held void and insufficient to confer upon the woman a legal settlement in the town in which the alleged husband was domiciled. Considering, apparently, the expediency of recognizing such marriages, the court advised young women of honor to shun the man "who prates about marriage condemned by human laws, as good in the sight of Heaven. This cant, she may be assured, is a pretext for seduction." This is worthy of consideration, but is not entitled to great weight in interpreting a statute which declares marriage a civil contract.

Besides, the cases come before the courts after the harm is done, and it cannot be very inequitable to hold the seducer to his contract.

The lessons of the past are not to be lightly disregarded, and almost every people have some mode of recognizing these informal marriages. The laws of the Jewish people upon this subject received great consideration, experts were examined and the works of the learned Maimonides and the Beth Joseph consulted, in *Lindo v. Belisario,* 1 Hagg. Con. Rep. 216, Id. Appendix, 7, and it was thought that under both the Jewish and the canon law such marriages were recognized. By the canon law as it existed before the Council of Trent in 1563 (Hist. Council of Trent, Brent's Trans. (1675) 707), and after that in those countries which denied the authority of that council, this private contract of marriage was recognized and upheld. Phillimore, in ch. 7 of vol. 1 (2d ed.) of his learned treatise on Ecclesiastical Law, says that although this law desired marriages to be solemnized openly it did not consider such public solemnization essential to the validity of the bond, and cites the learned and much quoted opinion in *Dalrymple v. Dalrymple,* 2 Hagg. Con. 54, 4 Eng. Eccl. 48, to the same effect.

Sometimes the equities are worked out by permitting a suit for annulling such marriage in which the marriage obtains a partial recognition or a formal marriage may be decreed; as by the Code Napoleon, which by sec. 165 requires that marriage be celebrated before a civil officer, but further specifies who may impeach an informal or irregular marriage, and by sec. 201 provides that a marriage which has been declared null draws after it, nevertheless, civil consequences as well with regard to the married parties as to their children, when the marriage has been contracted in good faith. By the German Civil Code a marriage is declared void if not entered into with the prescribed ceremonial (sec. 1317). But the invalidity of marriage upon this ground is established by means of an action for nullity (nichtigkeitsklage), and the voidable marriage is valid to all intents and

.8]. JANUARY TERM, 1913. 235

Baermann v. Chicago & Milwaukee Electric R. Co. 153 Wis. 235.

purposes until avoided by such a suit. Id. secs. 1324, 1329. Indeed, the notion of an inferior sort of contract made without ceremony, good when fully executed but otherwise without enforceable obligation, runs through all law. It is reflected in the ancient Roman "Pactum," "Sponsio," and "Jusjurandum," as well as in our law, which at different stages of its growth required for the validity of certain contracts the ceremonial of a seal, livery of seisin, signature or writing, earnest money, etc. This is also observable in the codes mentioned and in Walton's Civil Law in Spain and Spanish America, arts. 1216, 1223, and 1225. So that where the statute law declares marriage a civil contract, although the duties and obligations arising from such contract and the status thereby created are fixed by law, there are many precedents, reasons, and analogies for the rule that, in the absence of statute expressly declaring such marriage invalid, an informal contract of marriage, *i. e.* one made between competent parties without the legal ceremonies and in the absence of the clergyman or civil officer, is, when consummated by cohabitation, valid and binding upon the parties. If follows that the judgment of the circuit court should be affirmed.

*By the Court.*—Judgment affirmed.