JOHN B. MARSICANO, *Appellant,* v. MABEL MARSICANO, *Appellee.*

## Opinion Filed March ·19, 1920.

1. Where a suit for alimony is brought under Section 1933 General Statutes, 1906, predicated upon the existence of a ground for divorce, the complainant should allege and prove residence in this State for the requisite statutory period before the ling of the bill, and also the existence of the marital relation between the complainant and the defendant, and a ground for divorce under the statute in favor of the complainant.

2. The common law is in force in this State, except where it is modified by competent governmental authority.

3. No statute of this State expressly or by fair implication renders invalid or void marriage contracts between competent parties that are consummated under the recognized rules of the common law.

4. Marriage is something more than a mere contract, though founded upon the agreement of the parties. When once formed, a relation is created between the parties which they cannot change; and the rights and obligations of which depend not upon their agreement, but upon the law, statutory or common. It is an institution of society, regulated and controlled by public authority.

5. The two essentials of a valid marriage at common law are capacity and mutual consent, and it is well settled that under the common law the marriage relation may be formed by words of present assent, *per, verba de praesenti,* and without the interposition of any person lawfully authorized to solemnize marriages, or to join persons in marriage.

6. To constitute a valid marriage *per verba de praescnti* there must be an agreement to become husband and wife immediately from the time when the mutual consent is given. An ex-

press future condition is absolutely fatal to a claim of marriage, and cannot be explained away by circumstances.

7.   Marriages *per verba de futoro cum copula* are not recognized in this State.

8.   The evidence does not show a marriage *per verba de praesenti.*

An Appeal from the Circuit Court for Hillsborough County; F. M. Robles, Judge.

Decree reversed.

*Zewadski & Zewadski* and *J. W. Cone,* for Appellant;

*Dickenson & Dickenson,* for Appellee.

WHITFIELD, J.—In the bill of complaint filed herein January 16, 1919, by Mabel Marsicano it is alleged "that she is a resident of the County of Hillsborough and is and has been a resident of the State of Florida for more than two years last past and prior to the filing of this bill of complaint; that on or about the 28th day of April, 1917, your oratrix secured a divorce from her husband, Angel Ramos, and was a feme sole and the said defendant was at the said time, a bachelor and your oratrix and the said defendant were competent to contract the marital relationship, and agreed together to be and become husband and wife, and thereupon consummated the said agreement by actually living and cohabiting together as husband and wife, both parties hereto and to said marriage agreement, being over the ages of twenty-one years of age, and there being no legal impediment whereby the said parties could not lawfully intermarry, they secured no marriage license according to the provisions of the statutes of the State of Florida, which were then

in force, no license was ever issued or procured for. the intermarrying of the oratrix and the said defendant; and while no marriage ceremony was ever performed, between your oratrix and the said defendant by any minister of the gospel or any other person, yet, your oratrix and the said defendant agreed with each other to be husband and wife as aforesaïd, and your oratrix immediately assumed the name of Mabel Marsicano and from the time of such agreement, they lived and cohabited together in the relation of husband and wife until the 30th day of December, 1918, and during all of said time, your oratrix and the said deefndant not only lived and cohabited together as husband and wife, but they were known and received as man and wife by a large circle of acquaintances, and the said defendant and your oratrix rented a certain premises at No. 1548 Franklin Street in the City of Tampa, in the name of Mrs. Mabel Marsicano and there lived and cohabited as aforesiad as husband and wife and ever since said time, your oratrix was never known by any other name than that of Mabel Marsicano and lived in their own home and has their own residence in the City of Tampa, as aforesaid, until about five weeks ago, at which time the defendant in company with your oratrix, went and engaged apartments from Mr. and Mrs. Thorpe at No. 1004 Florida avenue, in the City of Tampa, and there lived and cohabited as husband and wife until the said 30th day of December, 1917, and that during all of said time your oratrix and said defendant traded in different stores, attending public dances and . other functions and were introduced, one by the other and held themselves out to the public as husband and wife and that during all of said time, your oratrix demeaned and conducted herself toward the said defendant as a true, kind and indulg-

ent wife, performing her marital duties to the best of her ability; that the said defendant, on the 30th day of December, 1918, notwithstanding his marital duties and obligations, wilfully and without cause, deserted your oratrix and ever since said time has persisted in such desertion and your oratrix is now living apart from the said defendant through his fault; that the said defendant, notwithstanding his marital duties and obligations, on the said 30th day of December, 1918, and on divers dates and other times unknown to your oratrix, in the City of Tampa and its suburbs, a more particular description is hereof unknown to your oratrix, has committed adultery with one Nellie McKay and with divers other women whose names are unknown to your oratrix."

The prayer is for temporary and permanent alimony and solicitor's fees, and for general relief.

By an unsworn answer the defendant denied "that he ever entered into an agreement with the complainant that they should become husband and wife, and further denies that they lived and cohabited together as husband and wife; denies that Mabel Ramos ever assumed the name of Mabel Marsicano, to his knowledge, until the time of his notification of the bringing of this suit; denies that they were known and received as man and wife by a large circle of acquaintances or that they rented certain premises at No. 1548 Franklin Street, in the name of Mabel Marsicano, or that they lived and cohabited there as husband and wife, or that defendant in company with Mabel Ramos engaged apartments with Mr. and Mrs. Thorpe at No. 1004 Florida Avenue, and there lived and cohabited as husband and wife, or that defendant allowed the complainant to trade at stores, using his name as her husband, or that they attended

public dances and other functions and were introduced as husband and wife, or that complainant ever demeaned or conducted herself toward defendant as his wife; denies that on the 30th day of December, 1918, he wilfully and without cause deserted complainant, for that there was no relation existing between them whereby he was bounden to or obligated to remain in the presence of or to live with the complainant; denies that on the 30th day of December, 1918, or any other day or time, in the City of Tampa, or its suburbs, that he committed adultery with one Nellie McKay or with any other woman."

Testimony was taken and the chancellor decreed the payment of seven dollars a week "as and for temporary alimony *pen dente lite* until the further order of the court in the premises," and also decreed the payment of forty dollars as "a reasonable temporary solicitor's fee." The defendant appealed.

Where a suit for alimony is brought under Section 1933, General Statutes, 1906, predicated upon the existence of a ground for divorce, the complainant should allege and prove two years' residence in this State before the filing of the bill, and also the existence of the marital relation between the complainant and the defendant, and also a ground for divorce under the statute in favor of the complainant. In this cause a common law marriage is alleged, and as a ground of divorce adultery by the defendant is alleged.

The common law is in force in this State, except where it is modified by competent governmental authority. No statute of this State expressly or by fair implication renders invalid or void marriage contracts between competent parties that are consummated under the rules of common law. Caras v. Hendrix, 62 Fla. 446, 57 South. Rep.

345; Warren v. Warren, 66 Fla. 138, 63 South. Rep. 726; Becker v. Becker, 153 Wis. 226, 140 N. W. Rep. 1082, L. R. A. 1915 E, 56.

"Marriage is everywhere regarded as a civil contract. Statutes in many of the States, it is true, regulate the mode of entering into the contract, but they do not confer the right. Hence they are not within the principle, that, where a statute creates a right and provides a remedy for its enforcement, the remedy is exclusive. No doubt, a statute may take away a common-law right; but there is always a presumption that the Legislature has no such intention, unless it be plainly expressed. A statute may declare that no marriages shall be valid unless they are solemnized in a prescribed manner; but such an enactment is a very different thing from a law requiring all marriages to be entered into in the presence of a magistrate or a clergyman, or that it be preceded by a license, or publication of banns, or be attested by witneses. Such formal provisions may be construed as merely directory, instead of being treated as destructive of a common-law right to form the marriage relation by words of present assent. And such, we think, has been the rule generally adopted in construing statutes regulating marriage. Whatever directions they may give respecting its formation or solemnization, courts have usually held a marriage good at common law to be good, notwithstanding the statutes, unless they contain express words of nullity." Meister v. Moore, 96 U. S. 76, text 78; Daniel v. Sams, 17 Fla. 487.

"Marriage is something more than a mere contract, though founded upon the agreement of the parties. When once formed, a relation is created between the parties which they cannot change; and the rights and obliga-

tions of which depend not upon their agreement, but upon the law, statutory or common. It is an institution of society, regulated and controlled by public authority." Maynard v. Hill, 125 U. S. 190, 8 Sup. Ct. Rep. 723.

"The two essentials of a valid marriage at common law are capacity and mutual consent, and it is well settled that under the common law the marriage relation may be formed by words of present assent, *per verba de praesenti,* and without the interposition of any person lawfully authorized to solemnize marriages, or to join persons in marriage. To constitute marriage *per verba prasenti,* the parties must be in the presence of each other when the agreement is entered into, but it need not be made in the presence of a witness, though without witnesses it may be difficult to establish it. The parties may express the agreement by parol, they may signify it by whatever ceremony their whim or their taste or their religious belief may select; it is the agreement itself, and not the form in which it is couched, which constitutes the contract; and the words used or the ceremony performed are mere evidence of a present intention and agreement of the parties. To constitute a valid marriage *per verba de praesenti* there must be an agreement to become husband and wife immediately from the time when the mutual consent is given. An express future condition is absolutely fatal to a claim of marriage, and can not be explained away by circumstances. It shows mental reservations which are incompatible with consent. This is true whether the condition relates to the creation of the marriage status, or to the duration of the relations of the parties. As there can be no contract *per verba de praesenti* where the marital status is to become fixed in the future, it is not sufficient to agree to present cohabitation and a future regular marriage when more

convenient, or when a wife dies, or when a ceremony can be performed." 18 R. C. L., pp. 391, 392; Peck v. Peck, 12 R. I. 485; Cheney v. Arnold, 15 N. Y. 345; 26 Cyc. 839.

"Another form of common law marriage derived from the ancient canon law is that of *per verba de futoro cum copula*. A promise *de futoro* had, of itself, no legal effect; but if the parties who had exchanged the promise had carnal intercourse, its effect was to interpose a presumption of present consent which converted the engagement into an irregular marriage, and produced all the consequences attributable to that species of matrimonial cohabitation. This doctrine was indorsed by many early decisions showing that a marriage *per verba de futoro* was, after all, but a species of present consent, being upheld upon the fiction that at the time of the copula, con sent *de praesenti* was mutually given by the parties in consequence of the anterior promise. The instances in which the question has been presented in the American courts are comparatively few. In a great majority of instances an informal marriage is claimed to have been established by an agreement in present words, or sought to be inferred from evidence of cohabitation and reputation. But the doctrine has been recognized in a few jurisdictions, though there is a disposition to hold that marriage is merely evidenced, and not constituted, by this form of contract, and that such evidence may be overcome by facts showing that the parties did not intend at the time of the intercourse to enter into the marriage relation. Thus when it is shown that the parties after their engagement were all along looking forward to a formal ceremony to make them husband and wife, and never agreed or consented to become such without it, the *prima facie* case established by intercourse is overcome. And the prevailing rule in this country is that at the

time of the intercourse the parties must actually give themselves to each other in the marriage relation. In other words, there must be cohabitation, and that cohabitation must be matrimonial, and this means that the parties must regard the marriage relation as existing They must actually dwell together as husband and wife, mutually recognizing each other as such in pursuance of the marriage promise, and actually intending to constitute the relation of husband and wife. This approaches an entire rejection of the doctrine of marriage *per verba de futoro,* since it requires cohabitation, which, together with reputation, would, even if there were no express promise, raise a presumption of marriage. In some jurisdictions the doctrine has been rejected *in toto,* and it seems to be a shadow of its former self, even in the jurisdictions that have not expressly repudiated it as a whole; and it is a fair conclusion that the doctrine is nearly, if not quite, obsolete." 18 R. C. L., pp. 393, 394; Grigsby v. Reib, 105 Tex. 597, 153 S. W. Rep. 1124, L. R. A. 1915E, 1, and Notes; Klipfel v. Klipfel, 41 Colo. 40, 92 Pac. Rep. 26, 124 Am. St. Rep. 96, and Notes; 17 Eng. Ruling Cases; 165; Becker. v. Becker, *supra;* Farley v. Farley, 94 Ala. 501, 10 South. Rep. 646; 11 Am. & Eng. Ency. Law (2nd. ed.) 1181, 1182; Cartwright v. McGowan, 121 Ill. 388, 12 N. E. Rep. 737, 2 Am. St. Rep. 105; Reaves v. Reaves, 15 Okl. 240, 82 Pac. Rep. 490, 2 L. R. A. (N. S.) 353.

The complainant testified that she had "lived in Hillsborough County, Florida, seven or eight years, and continuously during the two years prior to January 16, 1919," when this suit was instituted. The complainant also testified that "it was agreed to, we would live together there and get married." . "It was agreed that we would later on have a marriage ceremony performed."

"Q. During the time you lived with him as husband and wife, did you ever have any agreement with him that your living as such would be considered a legal and valid marriage? A. Yes, sir. Q. In pursuance to that agreement, did you afterwards live with him as his wife? A. Yes, sir. Q. While you were living together, did you live all of the two years in the relation of husband and wife? A. Yes, sir. Q. Were you single at the time you were living together except the marriage to him? A. Yes, sir. Q. Was he a single man? A. Yes, sir."

On cross: "You say that when you and Marsicano began living together that you agreed at some future date to get married? A. Yes, sir. Q. Is it not a fact that no such an agreement was ever made? A. We did make that agreement. Q. Did you intend to carry out that agreement?. A. Yes, sir, I did. Q. What date was set? A. There was no particular date set. He just said if I would live with him and be true we would get married. Q. What was the date of having that agreement? A. It was when we were living together. Q. Well, when did you enter into the agreement to get married? A. It was about a year ago. Q. How long had you been living together? A. About a year. Q. Was it his solicitation or was it yours that this agreement was made? A. We both agreed. It was both of us. Q. You say that you and Marsicano are husband and wife, is that true? A. Yes, sir, it is. Q. Just what agreement did you and he have? A. We got to going together and we agreed that we would be married if I would stick to him. He said that if I would stick to him we would be married later on. Q. Just what agreement did you have as to your present marriage? A. No more than we lived together as husband and wife and agreed to live together and get married later on. Q. Just what agreement did you have as

to the date you would get married later on? A. We did not state any date. Q. Can't you state what agreement you had as to living together as man and wife? A. None, only we lived together as man and wife and he would introduce me as his wife. Q. Just what conversation did you and he have about your being his wife for the present time as near as you can remember, when and where? A. We were then living at 1548 Franklin Street. Q. I gather from your testimony that you were living together and were going together before you considered yourselves married, is that so? A. No, sir. Q. Did you start living together before the agreement was entered into? A. We lived together about two years and we considered we were man and wife. Q. Now, then, state what agreement you and he had when you first started to living together? A. The agreement was that we would live together as husband and wife and would be married in the future. He said if I would stick to him we would have a ceremony performed later on. Q. How came you to use his name? A. He ask me to take his name and introduce me to people as his wife. Q. Now, at what time and where at did you and he have this agreement that you would consider yourselves husband and wife? A. I don't remember exactly just when it was, but he made the proposal to me that if I would stay with him and stick to him we would get married later on. Q. What agreement did you and he have about that? A. He said that if I would stay with him and be true and a nice woman we would get married. Q. Was that the only agreement you had with him at that time? A. I can't answer that question because I don't understand the meaning of it. Q. Did he at any time while you were living together on Tampa Street or at the other places you lived together that you and he con-

sidered yourselves married at that time?  A.  Yes, sir.
Q.  When was that and where?  A.  The first time I
stayed with him or had anything to do with him.  Q.
From that time on did he take you and live with you as
his wife?  A.  Yes, sir.  Did he introduce you as his
wife to your friends and associates?  A.  Yes, sir.  Q.
Now, where were you living when you had this under-
standing with him?  A.  We were at 1003 Tampa Street
when we first began living together.  Q.  Did you agree
at that time to consider yourself as his legal wife?  A.
Yes, sir.  Q.  Did you agree to consider himself as your
legal husband?  A.  Yes, sir.  Q.  What was the pur-
pose of your discussing the question of procuring a li-
cense and a ceremony performed?  A.  I thought it was
better to get married than to be living like we were.  Q.
When was the first time after that agreement that he
denied that you were his wife?  A.  He never did until he
left me."

Several witnesses testified that the parties hereto lived
together and recognized and introduced each other as
husband and wife.

This evidence does not establish the relation of a
common law marriage between the parties that can be
recognized as such in this State.

The testimony not only fails entirely to show a mar-
riage *per verba de praesenti,* but actually negatives it.  It
may, however, tend to show a relation resembling a so-
called marriage *per verba de futoro cum copula;* and to
sustain this decree we would have to sanction this class
of marriages in Florida.

Marriages *per verba de futoro com copula* have never
been recognized in this State.  In most of the cases where
this doctrine seems to be recognized, there was such a

condition of facts as almost to bring them within the doctrine of a marriage *per verba de praesenti.*

The ancient doctrine of marriages *per verba de futuro cum copula* is so nearly if not entirely repudiated in this country that we will not give effect to it in this State, fraught as it is with such serious consequences to innocent persons who might enter into a recognized form of marriage with a person whose prior relations with another partook so nearly of an illicit nature.

The decree is reversed.

All concur.