### PARKS v. PARKS.

(Fourth Division. Fairbanks. October 27, 1921.)

#### No. 390–I.

**1. Divorce ⊜⊃39, 252—Marriage—Husband and Wife.**

In 1906 the defendant, a white man, met an Indian woman on the Kuskokwim river and agreed to take her as his wife. She went with him up the river to his camp, and thereafter lived with him as his wife. In 1910 the commissioner in that precinct advised defendant that he was cohabiting with the woman in a state of adultery, and that, since they had children, he must marry the woman according to law or he would be prosecuted. Thereupon they were married before the commissioner in 1910 in compliance with the forms of law. After the

⊜⊃See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

time when the parties voluntarily agreed to live together as husband and wife in 1906, the defendant located and possessed 11 valuable cinnabar mining claims at the Parks mines on the Kuskokwim river. Thereafter the wife brought this suit for divorce and for a share of the property so acquired by their joint efforts. On trial, *held*, the plaintiff and defendant became husband and wife by virtue of a common-law marriage in 1906; that all property thereafter acquired by them was so acquired by the joint efforts of both, and for repeated acts of cruelty the plaintiff was entitled to a divorce from the defendant and one-half of all the property so acquired by them from 1906 to the date of divorce.

### 2. Dower ☞12(1)—Husband and Wife—Mines and Mining.

A married man, a locator of unpatented mining claims under the laws of the United States, has not such an interest in the property as will sustain a claim for dower therein against the grantee of the husband.

### 3. Divorce ☞322—Future Disposition of Property.

Questions that are determined at the trial of a cause upon the issues presented by the pleadings are res adjudicata, and are not subject to further determination upon the order to show cause in subsequent proceedings. Where it appears, however, in a divorce case, that the court did not make specific findings as to exact property acquired through the joint efforts of the parties, the court may hear and determine such issue on an order to show cause.

### 4. Divorce ☞298(1)—Custody of Children—Guardian.

Where on judgment of divorce it appears that neither of the parents is fit and competent to have the custody of the children, the court may appoint a guardian and require the parents to provide for their maintenance by such guardian.

The plaintiff herein on the 9th day of February, 1920, filed an action in equity in this court against the defendant praying that the bonds of matrimony between herself and the defendant be dissolved, and that the custody of their five minor children be awarded to her; also that such portion of their community property be allowed and set apart to her as the court should find to be equitable and just, and that in the meantime the defendant be enjoined and restrained from disposing of or incumbering any of the property owned by him.

In paragraph III of her complaint plaintiff alleges:

"That plaintiff and defendant intermarried about 14 years ago at a village on the Kuskokwim river, in what is now the Kuskokwim precinct, Fourth division, territory of Alaska, and ever since have been and now are husband and wife."

And in paragraph LX:

"That at the time of said marriage the defendant had no property whatever, and that which he now has is the result of the joint labors of both plaintiff and defendant, and this plaintiff is entitled to one-half of all of such property."

In his answer to plaintiff's complaint the defendant admitted both paragraphs above set forth.

Issue having been joined, the case was tried to the court without a jury. By its findings of fact dated September 8, 1920, the court found:

"(2) That about the year 1908 the said plaintiff and defendant were intermarried at or near Sleitmute village on the Kuskokwim river in said Fourth division of Alaska, and ever since have been, and are now, husband and wife. * * *

"(6) That the defendant has some property and means which from the evidence is not fully disclosed. That said property consists of an undisclosed interest in 11 cinnabar mining claims, a reduction plant, a trading post and store, all situate on the Kuskokwim river in the Fourth division of Alaska, and certain shares of stock and other interests in the Parks Mining & Trading Company, a corporation, which said corporation claims an interest in the said described property.

"(7) That it is admitted by the defendant's answer on file herein that the defendant had no property whatsoever, at the time of his marriage with plaintiff, and that that which he now has is the result of the joint efforts of both plaintiff and defendant, and that the plaintiff, Maggie Parks, is the owner of an undivided one-half interest in and to all property, real or personal, acquired by the defendant, E. W. Parks, since the time of their said marriage, all of which said property is now in the custody and possession of said defendant and held in trust by him for her use and benefit."

And that upon many occasions, as fully recited in the findings, the defendant had inflicted upon the plaintiff cruel and inhuman treatment calculated to impair her health and endanger her life.

The court further found that the plaintiff was incompetent to look after her own property.

By reason of said findings of fact the court's conclusions of law were: That the plaintiff was entitled to an absolute decree of divorce from the defendant; that plaintiff was entitled to an undivided one-half interest in, of, and to all property acquired by and in the name of the defendant E. W. Parks since the time of their marriage; and that a trustee

should be appointed to look after the interests and property of the plaintiff.

A decree entered on the same day provided:

"(1) That the bonds of matrimony heretofore existing between the plaintiff, Maggie Parks, and the defendant, E. W. Parks, be, and the same are hereby, dissolved and forever terminated. * * *

"(8) It is further ordered, adjudged, and decreed by the court that the plaintiff, Maggie Parks, be, and is hereby, declared to be the owner of an undivided one-half interest of, in and to all property, real or personal, acquired or owned by the defendant, E. W. Parks, which said property of the said plaintiff is held by the defendant, E. W. Parks, in his name, for the use and benefit of the plaintiff, and it appearing to the court that the said plaintiff is incapable of handling or otherwise managing the said property, and that a trustee should be appointed to take charge of and manage the same, and it further appearing to the court that A. H. Twitchell is a fit and proper person to be appointed such guardian, it is further ordered, adjudged, and decreed that the said A. H. Twitchell be, and he is hereby, appointed trustee of the estate of the plaintiff, Maggie Parks.

"(9) It is further ordered, adjudged, and decreed that the defendant, E. W. Parks, shall, on the written demand of the trustee of the said estate of Maggie Parks, make, execute, and deliver to the said trustee for the use and benefit of the said plaintiff a good and sufficient deed of conveyance of an undivided one-half interest of, in, and to such property, real or personal, which the said defendant has acquired since the said marriage of plaintiff and defendant and owned by the defendant at the time of the commencement of this action."

The said A. H. Twitchell, having duly qualified as such trustee, made the following demand in writing upon the defendant:

"Flat, Alaska, February 6, 1921.

"Mr. E. W. Parks, Parks Mines, Kuskokwim River, Alaska—Sir: You will please take notice that the undersigned A. H. Twitchell, duly qualified and acting trustee for Maggie Parks, hereby demand that you make proper account of all property, cash and shares of stock, etc., held or belonging to you or in your name, or in the name of any person or persons representing you as trustee, on the 6th day of February, 1920, and leave a copy of such accounting with me at Flat, Alaska, within thirty days from the date of the service of this notice upon you.

"You are further notified that demand is hereby made upon you to convey, by deed or other proper instrument in writing, to myself as trustee, a one-half interest in and to all property, cash, and shares of stock, etc., belonging to you or under your control on the said 6th day of February, 1920. And in case of your failure to comply

with this written demand within the time prescribed by law I shall apply to the district court for the relief herein asked.

    "Respectfully,                      A. H. Twitchell, Trustee."

To this demand the defendant made answer as follows:

                          "Flat, Alaska, March 12, 1921.

    "A. H. Twitchell, Flat, Alaska—Sir: Complying with your demand of Feb. 6, 1921, I will state that after careful investigation I find that there is no property of any description held by myself that I have acquired since my marriage to Mrs. Maggie Parks and which I owned before the 6th day of February, 1920.

    "Respectfully,                           E. W. Parks."

Such further proceedings were had that on July 11, 1921, the court issued an order to the defendant directing him to appear and make answer concerning his property and to show cause why he should not transfer one-half of his property to A. H. Twitchell, trustee, to be held in trust for the use and benefit of the plaintiff. In response to said order the defendant appeared and filed a verified answer setting forth that he owned no property acquired since his marriage, and that he was not married to the plaintiff until 1910.

Albrecht & Taylor, of Iditarod, for plaintiff.

E. Coke Hill, of Fairbanks, for defendant.

BUNNELL, District Judge. Questions that were determined at the trial upon the issues presented by the complaint, answer, and reply are res adjudicata and are not the subject of determination upon the order to show cause herein. It appears, however, that the court did not make a specific finding as to the exact property acquired through the joint efforts of the plaintiff and the defendant, nor did it seem necessary at that time to determine the exact date of the marriage between the plaintiff and the defendant. These issues are now raised by the answer of the defendant. This is a proceeding in equity, and in my opinion it is the duty of the court to ascertain what the facts are in order that the rights of these parties may be determined.

On the question of when the marriage actually took place, the evidence of the plaintiff, though contradicted by the defendant in many details, shows the following state of facts:

In 1906 the plaintiff was at Russian Mission. She was the mother of a boy five or six years of age whose father was

not the defendant herein. The plaintiff is a· native Indian, and was at that time, and is now, terribly crippled, but in spite of this misfortune has raised a large family of children and has generally attended to her duties as a housewife. I shall quote her evidence given in answer to questions propounded by the court:

"The Court: ·Q. Maggie, after Alice was born why did you go back to Mr. Parks? A. Because I going to have pretty soon a baby.'

"Q. After you had the first baby, Alice, and went back, did Mr. Parks say anything to you about marrying you? (No answer.)

"Q. Did Mr. Parks tell you he wanted you to be his wife? A. Yes; he told me ·he wants to marry me.

"Q. What did he say? A. And I said, 'I don't know,' and after that I said, 'Yes; if you want to.' That is all I told him.

"Q. Was that before Jackson was born? A. No; 1909 before Jackson was born, and Jackson was going to be born pretty soon another year 1910.

"Q. Was that the first time he talked to you about your being his wife? A. No; he has always talked to me for a wife the first time when he was down at Russian Mission, and I go.

"Q. What did he say to you at that time? A. He wants to take me as his wife, take me up the river.

"Q. What did you say? A. I told him, 'If you be a good man I go with you, and I don't like bad men so much like that,' ·I told him. I am pretty scared for that. He said he would be good to me, and I know for that and I go with him.

"Q. Now, do I understand you right? He told you then he wanted you for his wife? A. Yes.

"Q. And you told him you would go? A. Yes.

"Q. When did you make up your mind you would be his wife? When did you tell him you‚would be his wife? A. I never told him I would be his wife; no, sir.

"Q. You didn't tell him? A. I never bother with that man. He bothered me first right then.

"Q. After you went with him when did you first tell him you would be his wife? Maybe I don't understand you, or maybe you don't understand me. Down at Russian Mission you say he wanted you to be his wife? A. Yes; he wants to get me for his wife.

"Q. What did you tell him? A. And I didn't answer him quite at all, I answer then; 'I don't know,' I told him.

"Q. What did you tell him before you went up the river; did you tell him anything about being his wife before you went up the river? A. I don't understand that—'his wife.'

"Q. That means, marry him, to live with him as his wife. A. Yes; I live with him and be his wife, his own wife. I live with him a little while up there.

"Q. Did you tell him that at Russian Mission? A. No; I never told him. He told me first.

"Q. Yes; I know. He told you he wants you for his wife. Then what did you say? A. I told him, 'Yes; if you want to.' That is all I said.

"Q. And did you go with him then? A. And I go with him then.

"Q. And you lived with him? A. And I living with him away up where we go. In the night we go, I know that.

"Q. That was in 1906, you say? A. 1906 in the summer time.

"Q. He lived with you that winter? A. He lived with me all this winter. We are living together all this winter, all winter and all summer.

"Q. Lived in the same tent and house? A. In the same house. The same old house is there.

"Q. Did he sleep with you up there? A. You bet your life, just the same one bed we got, just the same one bed we have.

"Q. Did he eat with you? He eat with me. I cook for him every time, and in the morning, breakfast time, wake him up."

In her testimony the witness confuses the word "marry" with what she understands to be the ceremony of marriage, but the facts are plainly evident. The defendant would have the court believe that he was not married to the plaintiff until the solemnization of marriage in the year 1910 by a United States commissioner, and that from 1906 to 1910 he was cohabiting with the plaintiff in a state of adultery. The first child, Alice, was born in 1907. In my opinion the evidence is quite sufficient to establish the fact that there was a common-law marriage between the plaintiff and defendant during the summer of 1906. McDaniels v. McDaniels, 5 Alaska, 107; Reed v. Harkrader (C. C. A.) 264 Fed. 834; Grigsby v. Reib et al., 105 Tex. 597, 153 S. W. 1124, L. R. A. 1915E, 1, Ann. Cas. 1915C, 1011; Becker v. Becker, 153 Wis. 226, 140 N. W. 1082, L. R. A. 1915E, 56; University of Michigan v. McGuckin et al., 62 Neb. 489, 87 N. W. 180, 57 L. R. A. 917.

The record discloses that under the laws of the United States the defendant staked and acquired 10 lode mining claims in the territory of Alaska during the years 1907, 1908, and 1909, and that on the 17th of December, 1919, he transferred this property by an instrument in writing to Parks Mines & Trading Company, a corporation organized and existing under and by virtue of the laws of the state of Washington. These claims are all unpatented lode mining claims located in the now Kuskokwim recording precinct, Fourth judicial division. The capital stock of the Parks Mines & Trading Company is divided into 4,000 shares of the par

value of $100 per share. By virtue of this transfer the defendant acquired 2,100 shares of said capital stock. The instrument of transfer is in form a quitclaim deed, but was not entitled to be recorded because there are no witnesses thereto as required by section 508 of the Compiled Laws of Alaska. It was duly acknowledged, and was filed for record on the date of its execution with the recorder for the Kuskokwim precinct. Section 524 of the Compiled Laws provides that—

"Every conveyance of real property within the district hereafter made which shall not be filed for record as provided in this chapter shall be void against any subsequent innocent purchaser in good faith and for a valuable consideration of the same real property. or any portion thereof, whose conveyance shall be first duly recorded."

As between the parties the instrument of conveyance was valid. 8 R. C. L. § 17, pp. 940 and 941; Waskey v. Chambers, 224 U. S. 564, 32 Sup. Ct. 597, 56 L. Ed. 885, Ann. Cas. 1913D, 998; Fulton v. Priddy, 123 Mich. 298, 82 N. W. 65, 81 Am. St. Rep. 159; Agar v. Streeter, 183 Mich. 600, 150 N. W. 161, L. R. A. 1915D, 196, Ann. Cas. 1916E, 518; Stamp v. Steele, 209 Mich. 205, 176 N. W. 467; and as stated in 13 Cyc. 559:

"But although a deed may by reason of defective attestation fail to pass legal title, yet it may operate to vest an equitable title in the grantee."

Under the authority of Black v. Elkhorn Mining Co., 163 U. S. 445, 16 Sup. Ct. 1101, 41 L. Ed. 221, the wife of the defendant, the plaintiff herein, was not required to sign the deed of conveyance of the mining claims in order to make it a valid transfer. I quote the syllabus:

"A locator of an unpatented mining claim under the laws of the United States, having only the possessory rights conferred by those laws, has not such an interest in the property as will sustain a claim for dower therein against the grantee of the husband."

Her position is not that of a subsequent innocent purchaser in good faith and for a valuable consideration, and I am of the opinion that her rights cannot be measured and determined by any such test.

By his answer the defendant admitted paragraph IX of the plaintiff's complaint. This paragraph is as follows:

6 A.R.—28

"That at the time of said marriage the defendant had no property whatever, and that which he now has is the result of the joint labors of both plaintiff and defendant, and that this plaintiff is entitled to one-half of all such property."

The defendant admitted this paragraph on the theory that he had no property, but the evidence shows that he has 2,100 shares of the capital stock of the Parks Mines & Trading Company. The following testimony given by the defendant upon the order to show cause seems to me to fairly disclose its ownership and the control of the defendant over it:

"By Mr. Taylor: Q. Did you ever transfer that stock? A. Before that time?

"Q. Yes. A. No; I don't think I did.

"Q. At whose instigation did you transfer that stock, at whose request? A. Nobody's request.

"Q. How did you transfer that stock? A. By giving the transfer. We have it here somewhere, a copy of it, I believe. I think I have it in my pockets, if you want to see it, a copy of it. I transferred it, though, just by a paper; sent an order with the transfer to have it transferred on the books to Nora Dunn.

"Q. Without any request from them? A. No; there was no request from anybody; I done it all myself.

"Q. Did you have the stock in here? A. No.

"Q. Did you make any indorsement of that stock? A. Make an indorsement of it?

"Q. Yes; on the stock. A. No; I sent an order to Sol Friedenthal, vice president, to do it for me.

"Q. What did you receive for that indorsement or transfer? What was the consideration? A. I didn't receive anything for it. I didn't ask anything.

"Q. Now, as to the stock that you testified to, you say in your answer that there was issued to you 2,100 shares. Did you have any other stock besides that? A. No; I didn't have any other stock besides that that I know of.

"Q. Was all the stock issued as called for by the articles of incorporation? A. There was $50,000 worth, I believe, not issued which might be sold later for improvements of the mine, on the mine.

"Q. The capital stock of that corporation, according to the articles of incorporation, was 4,000 shares of $100 each. That was right was it? A. Yes.

"Q. And, of the $350,000 worth of stock that was left, you received three-fifths of it? A. Yes.

"By Mr. Hill: Q. You transferred this stock on February 7th to Nora Dunn did you? A. Yes sir.

"Q. Why did you transfer it to Nora Dunn? A. Nora Dunn was my neice and one of my best friends, and she has always wanted to take care of my children, me having in mind the taking care

of my children, and I wanted to do the very best I could for them and I instructed Nora Dunn to use my property for the benefit of my children, and, if the investment of my brother should prove unproductive and he didn't get the money out, I wanted her to reimburse, or out of some part of my property and the stock which she held to keep him from losing any money from his children in the investment he had made there. And that was the reason why I transferred the stock to Nora Dunn, for the protection of my children and to protect my brother in his investment."

The purpose for which the defendant caused this stock to be delivered into the custody of his niece, Nora Dunn, is commendable. No valuable consideration passed from Nora Dunn to him to effect this transfer. The stock is still as much within the control and dominion of the defendant as the proceeds thereof would have been had he sold the stock for cash and deposited the proceeds in a bank subject to his order. Half thereof belongs to the plaintiff. It is no argument to say that he should still retain all this stock because the court has ordered him to pay a certain sum per month for the support and maintenance of the children born to the plaintiff and himself. It is true that the plaintiff is wholly incompetent to have either the custody and control of the children or the control of one-half of this stock. But the court has provided for this unfortunate situation and has appointed a guardian and trustee for her estate. Her property is in no way relieved from being used to provide for her children, and, if it develops that this stock is of great value, undoubtedly the court will in a proper proceeding require the plaintiff to assist in providing for the children. At present the defendant is required so to do, for he has the ability to provide for them, while the plaintiff is entirely without means to provide for herself.

The desire of the defendant to protect the investment his brother has made in this country is natural, but it is without any legal consideration, and must not be permitted to prejudice the maintenance and care of his own children.

The defendant, it appears, is the president of the Parks Mines & Trading Company, and as such it is within his power to expedite a transfer of 1,050 shares of the capital stock of said corporation to A. H. Twitchell, trustee. Taking into consideration the fact that the books of the corporation are in Seattle, and that the defendant resides on the Kuskokwim

river, the defendant is given 90 days from the service upon him of a copy of the order and judgment herein to effect a transfer and delivery of 1,050 shares of the capital stock to A. H. Twitchell, trustee for Maggie Parks, the plaintiff herein.

The court will sign findings of fact, conclusions of law, judgment, and order in accordance with the views herein ex-pressed.

⬤⟳See same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes