**MARYLAND CASUALTY COMPANY,**
Appellant,

v.

**Violet F. BISHOP, Appellee.**

**No. 18206.**

United States Court of Appeals
Fifth Circuit.

June 22, 1960.

Jackson L. Peters, Miami, Fla., for appellant, Knight, Smith, Underwood & Peters, Miami, Fla., of counsel.

Ted P. Galatis, Fort Lauderdale, Fla., for appellee.

Before HUTCHESON, JONES, and WISDOM, Circuit Judges.

HUTCHESON, Circuit Judge.

This is an appeal from a final judgment entered on the verdict of a jury in favor of the plaintiff, Violet F. Bishop, and against the garnishee, Maryland Casualty Company,[1] in the sum of $10,-

---

1. The plaintiff, Violet F. Bishop, recovered a judgment in the amount of $20,-000.00 against one Jerrold C. Berry and Marion W. Houck, for personal injuries sustained in an automobile accident. The automobile in which plaintiff was riding as a passenger was owned by Berry and driven by Marion Houck. The insurance carrier for Berry paid $10,000.00 (being the extent of its limits) to the plaintiff in partial satisfaction of the judgment, whereupon plaintiff sued out a writ of garnishment against Maryland Casualty Company to require it to pay the balance of the judgment. The automobile operated by Marion Houck was not the in-

000.00, and from the order denying the garnishee's motion for entry of judgment and alternative motion for new trial.

Though it was established, indeed the garnishee proved that James and Marion together procured the policy from garnishee's agent, representing to her that Marion was his wife, and, though they paid the company a higher premium to obtain coverage for her, plaintiff did not seek to predicate liability on these facts, but accepted the issue tendered by the defendant's answer. The cause was, therefore, tried to the jury on the sole issue of whether or not Marion was the common law spouse of Houck under the Maryland policy of automobile liability insurance issued to him as named assured and covering his spouse. The relationship between James and Marion had not been solemnized by any ceremony, religious or civil. The claim that Marion was his spouse was based upon plaintiff's contention that a common law marriage between the two, valid under the law of Florida, existed, and the ultimate issue submitted to the jury and by them found in favor of plaintiff's contention was whether the existence of such a marriage was established by the evidence.[2]

sured vehicle under Maryland policy but instead was owned by Berry and insured through another company, and plaintiff undertook to prove that Marion was, under the policy, the legal spouse of James Franklin Houck, in order to avail herself of insuring agreement V, of the Maryland policy, which extends coverage to "other automobiles" used by the named assured or his "spouse".

2. Coming in without any real conflict, the facts are substantially these:

Marion Houck began living with James Franklin Houck sometime in the latter part of April or the first of May, 1956, the inception date as claimed by them of the common law marriage.

In February, 1956, Marion was working for the Telephone Company under the name Marion Irene Wymer. She was pregnant and secured a four-day leave of absence for the purpose of getting married. No marriage ceremony or other rites were performed. She returned four days later; told her employer that she had been married to Houck on February 25, and had the records changed to show her married name as Marion Houck. She did not actually begin living with James under the same roof until April or May of 1956.

On July 27, 1956, Marion gave birth to a child which she called Pamela Sue Houck, naming James as the father. Immediately following the birth of this child, Marion and James separated for a while, and, except for other brief separations, they have lived together since that date.

Marion testified that at the time she started living with James, the following words were spoken, but not in the presence of any witnesses:

"And he said that we would hold ourselves out as man and wife and that is the way we would act from here on * * * and I said that was the way I wanted it, also. And that was the only thing that was said."

Pressed by counsel for plaintiff for more details of what was said, she testified further:

"He said that he would support me and accept all of my responsibilities. And in return I said that I would take care of him and keep his house and do the regular duties of a housewife."

These statements were made at the time they first started living together, in April or May of 1956.

James had been convicted of breaking and entering and was placed on seven years probation by the judge of the Criminal Court of Record in Broward County. At the time the probationary sentence was imposed, on June 29, 1956, which was after the date of the alleged marriage, James told the judge that Marion was pregnant and that they had been living together and were common-law married. The judge admonished him that he should get married, and told him that was one of the reasons he was putting him on probation. The judge also told him at that time that he would have to get married by a preacher to make it really legal.

On September 25, 1956, James and Marion went to West Palm Beach and made application for and secured a marriage license. Both parties took oath before the Clerk of the County Judge's Court, that neither was married at the time the application was made. Each party signed the application and stated that neither had been married before. Marion and James then returned to Fort Lauderdale, with the intention of having a marriage ceremony performed. An argument ensued, whereupon Marion in a

The jury returned a verdict in favor of the plaintiff and against the garnishee, and final judgment was entered thereon.

■ Appealing from the judgment, the garnishee is here insisting: (1) that as matter of law the evidence was insufficient to support the verdict of the jury and a verdict should have been directed for it, and that the judgment must, therefore, be reversed and rendered; and (2) that, if this was not so, when the jury returned into court for further instruction on common law marriage, the court erred in giving an incorrect, incomplete and misleading charge, and the judgment must be reversed and the cause remanded.

We do not think so. On the contrary, we think: (1) that the evidence presented a fact issue for the jury, and the verdict finds full support in the evidence; and (2) that the giving of the additional instruction was not in any respect erroneous.

Grounding his argument on the decision of the Supreme Court of Florida in the Marsicano case, Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156, appellant incorrectly, we think, urges upon us that the facts of this case show it to be one of an attempt to invoke the doctrine of marriage per verba de futuro cum copula, and bring it directly within the condemnation of that decision. With full recognition of the earnestness and sincerity of appellant's contention, we are constrained to disagree with this view. It is true that the Houcks did testify that, in their ignorance of the law, they did not know, indeed did not believe, that their words and conduct had created a *legal* marriage and that they thought that to create such a marriage a marriage ceremony was necessary. It is also true, however, that they testified that, *legality aside*, they considered themselves married, and, equally true, that the evidence afforded ample basis for and support to the jury's ver-

---

fit of temper tore up the license and threw it at James. The net result was that no marriage ceremony was performed then or at any other time, though they continued to live together as man and wife.

Each testified that when they began living together, and for some time afterward, they did not know that a common law marriage was regarded as legal marriage.

Marion's career before the date of the so-called marriage was quite eventful. She gave birth to three children out of wedlock, by three different fathers, in the period July, 1952, to April, 1956, a period of less than four years, the last one James' child. Marion testified that she did not know when she began having sexual relations with James, except that they must have started at least as early as October or November, 1952.

Marion testified that at the commencement of the relationship, in April or May of 1956, that she did not regard her relationship with James as legal, that she did not think she had the legal right to call him husband, but that, as far as she was concerned, she was married, though she didn't know whether the law recognized this as a fact. She also stated: "The ceremony was to take place at a future date but the marriage had already

taken place as far as I was concerned"; also she told friends that "I was common-law married". She admitted giving a sworn statement in November, 1957, in which she testified:

Q: "Now I believe you are living with James Franklin Houck. Is that correct?"
A: "Yes, sir."
Q: "Are you married to Mr. Houck?"
A: "No, sir."

She testified further in effect that at the time she started living with James, she "did not know common-law marriage was legal", and that when she said she was not married, she meant in a legal sense which she thought required a license and a ceremony.

The plaintiff, as a part of her own case, introduced in evidence and read to the jury a sworn statement of James Franklin Houck, taken in November, 1957, in which he testified that Marion was not legally his wife but that he had gone to West Palm Beach to get a license to get married, but that Marion got mad and tore up the license; that he and Marion had agreed to live together until they could be married at some future time; and that he would not consider himself *legally* married until a ceremony was performed. He testified further that he considered himself married at common law, but not *legally*.

dict, that a common law marriage existed between them.

The difficulty with appellant's argument is, we think, that it is based upon the erroneous view that because the parties, laboring under a mistake of law, thought that what they had done, and were doing, was not legally effective to make a marriage, the requisite legal intent to make it was lacking. Cf. 17 C.J.S. Contracts § 145, Mistake of Law, page 500. Further, it has been held that the crime of bigamy may be based upon a prior common law marriage, the existence of which is shown by the required measure of proof, though the defendant did not know that the common law marriage was a legal marriage so as to make the second marriage bigamous. 7 Am. Jur., "Bigamy", Sec. 11, p. 754.

It is certainly true that, from the facts testified to, the jury could have found that there was no real intent to make a common law marriage, but we think it equally true that the jury could have found as it did. The facts which stand out in the record are the length of time that the parties have resided together, the fact that they have returned to live with each other after occasions of separation brought about by arguments and quarrels, the holding out of themselves to the public as husband and wife, the filing of a joint income tax return, the fact of giving the child their name, the purchasing of insurance policies together, and the fact that they have lived together with each of their respective parents. Taken together, these certainly show an intent to be married and lend credence to their testimony that they did make an agreement to live together as husband and wife under which they considered themselves as joined in marriage.

But for some of the language in the Marsicano case, supra, we think it would not be for one moment doubted that there was sufficient credible evidence to take the case to the jury and to support the verdict, and that the court below was, and we are, without power to substitute our judgment of the facts for that of the jury. The Marsicano case was not such a case as this. There was no question of the legitimacy of a child, the appeal was not, as here, from a final judgment on the verdict of a jury holding that there was a valid common law marriage. The appeal was from a decree for temporary alimony pendente lite until further order of the court, and, as the opinion shows, the appellate court determined for the purpose of that appeal that there was no basis for the decree pendente lite.

It is interesting to note that in Lambrose v. Topham, et al., Fla., 55 So.2d 557, 558, the Supreme Court clearly laid down the rule that, while it is true that one claiming a common law marriage has the burden of establishing a prima facie case, "It is well established in this state that the person who asserts the illegality of a marriage must assume the burden of proof of the assertion".

It is interesting to note also that in Fincher v. Fincher, Fla., 55 So.2d 800, 801, an appeal as Marsicano's was from an interlocutory order, requiring petitioner to pay certain sums for alimony and attorney's fees pendente lite, a divided court citing the Marsicano case, reversed the order and took it upon itself to outline for the benefit of the bench and bar the procedure which should be followed when a complaint alleging a common law marriage and seeking alimony and attorney's fees pendente lite is filed and its allegations are denied by the defendant.

In Chaachou v. Chaachou, Fla., 73 So. 2d 830, an appeal from an order, as in the Marsicano and Fincher cases, with respect to alimony, suit money, and attorneys' fees pendente lite, the court, citing Lambrose v. Topham, supra, with approval, and Le Blanc v. Yawn, 99 Fla. 328, 126 So. 789, 790, on facts no stronger than, indeed not as strong, for the claim of marriage, as those asserted here, found that a prima facie case had been made out sufficient to support the appellant's claim for alimony, etc.

A full and careful consideration of the facts of this case, in the light of the controlling principles, convinces us that the case was typically a fact case for the

jury, and the denial of the motion for directed verdict was not error.

 As to appellant's procedural ground, which asserts error in the giving of the supplemental charge to the jury, we find and hold that it is completely without substance. As the district judge correctly pointed out in his colloquy with counsel, the instructions were completely responsive to the jury's request and more would have been confusing and inappropriate. Nothing in what was said by him in any way departed from or was inconsistent with what he had already charged the jury, and the contention of appellant comes down simply to this, that, by not repeating all that he had said before, he had in some way withdrawn or modified it. No authority is presented in support of this conclusion, and we think that the authorities cited by appellant which are directly to the contrary represent a correct statement of the law. 89 C.J.S. Trial § 476, p. 121; Martin v. Tindell, Fla., 98 So.2d 473, at page 477; 5B C.J.S. Appeal and Error § 1782, p. 33.

Finally, we think we cannot do better in summary of the case than to adopt this statement from appellee's brief:

"We have here two people who have livd openly together as husband and wife since May 1, 1956, and who were yet living together at the time of the trial some three and one-half years later. They have brought a child into this world and have firmly established themselves in the community as husband and wife. Regardless of how one feels about the common-law marriage relationship, the law must be given effect. James and Marion Houck have had a sordid background. They have not always conducted themselves in the manner expected of married people. On the other hand there are many, many people who have been married by the church or by civil ceremony who have conducted and demeaned themselves and regarded their marriage relationship with much less respect than that shown by the Houcks. No one will deny that the law of Florida which still embraces the common-law type of marriage is antiquated and outdated. Nevertheless, it is the law of Florida until the legislature sees fit to abolish the same. An intelligent jury composed of eleven men and one woman decided the issue favorably to the appellee. They were well informed on the issues and all of the facts touching upon the question of the intent, consent and cohabitation of the parties to the marriage."

In conclusion, while what we have heretofore said has disposed of the case on the theory upon which it was tried, we think it not inappropriate to say that, had the case been tried on the theory that under the facts the insurance was intended to, and did, cover and protect Marion Houck as the person described as spouse, the evidence would, if believed by the jury, have supported a verdict for plaintiff.

The judgment was right. It is affirmed.