BRAWNER v ROYAL INDEMNITY CO.

(Circuit Court of Appeals, Fifth Circuit. December 17, 1917.)

No. 3120.

1. INSURANCE ⟨═⟩659(2)—ACCIDENT POLICY—ACTION—EVIDENCE—ADMISSIBILITY.

Where an accident policy excepted liability for death resulting from suicide, evidence that insured, whose death resulted from a pistol shot, had, because of his business troubles and the failure of a bank and companies in which he was interested, contemplated suicide, was admissible, even though the remarks of insured relative to suicide were made some time before his death, which occurred while he was alone and at a time when he was faced by a new crisis in his troubles; the fact that his financial condition remained the same rendering his previous statements germane.

2. WITNESSES ⟨═⟩150(1)—COMPETENCY—TRANSACTIONS WITH PERSONS SINCE DECEASED—"SURVIVOR."

Gen. St. Fla. 1906, § 1505, declares that no party to an action, nor any person interested in the event thereof, nor any person from, through, or under whom any such party or interested person derives any interest, or title by assignment or otherwise, shall be examined as a witness in regard to any transaction or communication between such witness and a person at the time of such examination deceased, against the executor, or administrator, heir at law, next of kin, assignee, legatee, devisee, or survivor of such deceased person. In an action on an accident policy, the beneficiary having introduced a renewal certificate countersigned by one who at the date of the certificate was a duly authorized agent of the company, the company introduced as a witness such agent, who testified that the insured had not paid the premium recited in the renewal certificate, and that he declined to renew the policy. *Held* that, as the beneficiary's rights under the policy did not accrue until the death of the insured, she could not be deemed his survivor, and the testimony of the agent as to the transactions with the insured was properly received, notwithstanding it was testimony as to a transaction with a deceased person.

3. INSURANCE ⟨═⟩145(3)—ACCIDENT POLICIES—DELIVERY OF RENEWAL CERTIFICATE.

The delivery by the insurer of a renewal premium receipt without payment by the insured of a premium due on an accident policy about to expire is merely an offer on the part of the insurer to enter into a new contract, and, if the offer is refused when tendered by the agent of the insurer, such refusal will be presumed to continue.

4. APPEAL AND ERROR ⟨═⟩1066—REVIEW—HARMLESS ERROR—INSTRUCTIONS.

Where there was no evidence tending to show that deceased changed his mind and decided to accept a renewal certificate of an accident policy after the expiration of the policy in force when it was tendered, that part of an instruction on the renewal of the policy which required the insured to accept the same before the expiration of the old policy was harmless, if erroneous.

⟨═⟩For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

In Error to the District Court of the United States for the Northern District of Florida; William B. Sheppard, Judge.

Action by Carro A. Brawner against the Royal Indemnity Company. There was a judgment for defendant, and plaintiff brings error. Affirmed.

This was an action by the plaintiff in error (hereinafter called the plaintiff), the beneficiary under a policy of accident insurance issued by the defendant in error (hereinafter called the defendant), originally in force for the term of one year ending September 21, 1914, which it was alleged was continued in force for 12 months ending September 21, 1915. The plaintiff sought to recover the sum agreed by the policy to be paid in the event of the death of the insured, Frank Eugene Brawner, if "caused solely and directly by violent external and accidental means, excluding suicide or any attempt thereat, whether sane or insane." The declaration alleged that on October 14, 1914, the death of the insured was caused "by violent external and accidental means, exclusive of all other causes, to wit, the accidental discharge of a loaded revolver and the entry of a ball or bullet therefrom into the head of said Frank Eugene Brawner." For defenses to the suit the defendant set up that the insured came to his death by suicide, and that the policy sued on was not in force at the time of his death. The evidence showed that the insured was killed by the discharge of a pistol. There was no eyewitness of the occurrence, which happened in the deceased's place of business in Pensacola at about 11:30 in the morning. There was evidence having some tendency to prove that the discharge of the pistol may have been accidental. Other evidence of circumstances attending the discharge of the pistol furnished support for the conclusion that Brawner committed suicide. On a verdict for the defendant, a judgment in its favor was rendered.

John P. Stokes, of Pensacola, Fla., and D. C. Campbell,.of Jacksonville, Fla., for plaintiff in error.

A. C. Blount, Jr., of Pensacola, Fla., and Shepard Bryan, of Atlanta, Ga. (Bryan, Jordan & Middlebrooks, of Atlanta, Ga., and Blount, Blount & Carter, of Pensacola, Fla., on the brief), for defendant in error.

Before WALKER and BATTS, Circuit Judges, and GRUBB, District Judge.

WALKER, Circuit Judge (after stating the facts as above). In December, 1913, the Pensacola State Bank, of which the insured was president, failed. This was followed by the failure of the Brawner-Riera Company and the Pensacola Investment Company, both of which were enterprises in which the insured was interested. In consequence of disclosures which followed the failures, a criminal charge of embezzlement was made against Brawner, on the trial of which he was acquitted. Another consequence was that Brawner expressed apprehension that he would be prosecuted for certain overdrafts made by the Brawner-Riera Company on the failed bank. The failures were also followed by the assertion by Mrs. Claudia B. Brawner, the widow of a deceased brother of Brawner, of a claim or demand that the latter settle with or reimburse her for $11,000 ($7,000 of which was insurance money collected after her husband's death), which had been deposited to her credit in the bank of which Brawner was president, and which, without the knowledge or authority of the depositor, was paid out on checks signed, "Claudia B. Brawner, per F. E. Brawner." Pri-

or to Brawner's death, he had not satisfied his sister-in-law or come to any settlement or understanding with her in regard to the claims she made against him. In the morning of the day of Brawner's death, she reached Pensacola, and, a few minutes before his death, stated to him over the telephone that she had come for a final settlement, a final understanding, and that she would like very much to see him and talk with him, and asked him to come to her hotel and see her. He replied that he would probably come at noontime.

[1] Over objections made by the plaintiff, the court permitted a witness for the defendant to state that Brawner, in a conversation with the witness in the spring or summer of 1914, said that "he had had so much trouble and he had been so hard pressed that it would have been better for him and his family if he could have got out of this trouble some time before, when he was in better shape than he was at this time in a financial way"; and permitted another witness to testify that Mr. Brawner, referring to the failure of the bank and the trouble and worry he had suffered on that account, said he felt very blue over the situation, and, one morning in the bank just after its failure, told witness he had gone to his desk once or twice and laid his hand on his revolver. The defendant's counsel asked another witness the following question:

"Had you any conversation with Mr. Brawner during the year previous to his death with reference to his business affairs? Since the failure of the Pensacola State Bank?"

The plaintiff objected to the admission of the testimony called for "unless connected up and brought down to the time propounded, and because the time inquired about is too remote." The objection was overruled, and the answer of the witness was:

"I had conversations at various times. I was his family physician, dated back prior to the failure of the bank, when this real estate question or slump—I can't tell you when this was, but it dated back beyond the time of the failure of the bank, and at various times up to the time of his death. He seemed in these conversations to be worried a good deal. Like a good many other people, he had real estate holdings bought on a high market, and he could not get rid of them; you all know how that is. He did say something about the failure of the Pensacola State Bank, but I don't know the times. I didn't jot it down or keep a memorandum of it. The result was that he was very melancholy, very much depressed, spoke of everything in a blue mood. That was up to a short time before his death. I had a conversation with him out to his house in the summer or fall, and he told me he was very much depressed, felt very blue over business. That was during the summer before his death."

Exceptions were reserved to the rulings just mentioned.

We are not of opinion that those rulings were erroneous. The evidence was such as to furnish support for the conclusion that the disturbing and harassing effect upon Brawner of the situation in which he was placed in consequence of the failure of the business enterprises in which he had been engaged continued up to the time of his death. Certainly, not the least troublesome feature of that situation was the assertion by Brawner's sister-in-law of her grievance because of the loss of her fortune, due to her misplaced confidence in him and in

the bank of which he was president.  Just before he came to his death he was confronted with the necessity of dealing at once with that grievance, and it may be inferred that he was much disturbed as to the probable outcome of his sister-in-law's visit.  Her statement over the telephone that she had come for "a final settlement, a final understanding," might well have been regarded by him as indicating a culmination of one of the troubles by which he was harassed, when, some time before, he indicated that he harbored the thought of self-destruction.  There can be no reasonable doubt about circumstantial evidence indicating suicide being strengthened by proof that there was a motive for the deceased taking his own life and that he had manifested a purpose or inclination to do so.  The fact that threats or intimations of suicide were made some time prior to the death in question does not make evidence of them inadmissible, when it is fairly inferable from circumstances disclosed that immediately prior to the death the deceased was subjected to a depressing influence which was the same as or similar to the one by which he was affected when, not very long before, the incidents testified to occurred.  As above stated, it was inferable from other evidence adduced in the instant case that the cause of the gloomy and despondent mood or state of mind, as to manifestations of which the witnesses referred to testified, had not ceased to exist at the time of Brawner's death.  This being so, the conclusion is that those incidents are not to be regarded as being too far removed in point of time and sequence from his death to justify the consideration of them in connection with other circumstances throwing light upon the question of his death being accidental or suicidal.  The evidence was admissible because of the light it was capable of shedding upon the motives or intentions of one whose death occurred under circumstances making it questionable whether it was due to accident or suicide.  Sharland v. Washington Life Ins. Co., 101 Fed. 206, 41 C. C. A. 307; Klein v. Knights and Ladies of Security, 87 Wash. 179, 151 Pac. 241, L. R. A. 1916B, 816 and note.

[2] The plaintiff introduced in evidence a renewal certificate or receipt, dated August 15, 1914, signed by an officer of the defendant company and countersigned by J. E. Daniels, who, on the date just stated, was an authorized agent of the defendant.  This paper, after stating the number of the policy set out as an exhibit to the declaration and the name of the insured, stated that:

"In consideration of fifty and 00/100 dollars ($50.00) the above numbered policy is, subject to all its terms and conditions, continued in force for twelve months ending September 21st, 1915, at noon (standard time)."

J. E. Daniels was examined as a witness for the defendant.  At the time of the trial he had ceased to be an agent of the defendant and was not then in any way connected with it.  He stated that he mailed the renewal receipt in evidence to Brawner in the latter part of August or early in September, 1914, which was prior to the date when the defendant's liability under a previously issued renewal certificate or receipt expired.  Over objections made in behalf of the plaintiff he was permitted to testify to the effect that Brawner, after the renewal receipt came into his possession, stated to the witness that he

was not able to pay the $50 it called for, and declined to renew the insurance; that on that occasion witness left the renewal receipt in Brawner's possession, with a request that he consider further the matter of renewing the insurance; but that Brawner never agreed to renew the insurance, and never paid or promised to pay the renewal premium. The objection to the competency of the witness to give this testimony was based upon the following Florida statute:

"No person, in any court, or before any officer acting judicially, shall be excluded from testifying as a witness by reason of his interest in the event of the action or proceeding, or because he is a party thereto: Provided, however, that no party to such action or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party, or interested person, derives any interest or title, by assignment or otherwise, shall be examined as a witness in regard to any transaction or communication between such witness and a person at the time of such examination deceased, insane or lunatic, against the executor, or administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such deceased person, or the assignee or committee of such insane person or lunatic; but this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir at law, next of kin, assignee, legatee, devisee, survivor or committeeman shall be examined on his own behalf, or as to which the testimony of such deceased person or lunatic shall be given in evidence." Florida Gen. Stat., § 1505.

It may be assumed, without being conceded, that the witness was "a person interested in the result" of the suit, within the meaning of the statute quoted, though he was not connected with the defendant at the time he gave his testimony, and though whatever interest he had was adverse to that of the party in behalf of which he testified. The statute does not forbid an interested person testifying in regard to a transaction or communication between such witness and a person at the time of such examination deceased unless he is examined as a witness "against the executor, or administrator, heir at law, next of kin, assignee, legatee, devisee or survivor of such deceased person." The claim made in behalf of the plaintiff is that she was a "survivor of such deceased person," within the meaning of those words as used in the statute. The connection in which the word "survivor" is there used, we think, makes it quite plain that it was intended to describe one who has succeeded to rights or obligations which were and would have remained those of the deceased person mentioned but for the latter's death. The plaintiff is not the "survivor" of the insured in such a sense. The right she asserts by the suit is not one which the insured ever possessed. The death of the insured was necessary to bring it into existence. It is a right which the contract alleged conferred on the plaintiff herself, not one which was vested in the deceased and which the plaintiff acquired by successorship from him. The statute did not have the effect of making the witness incompetent to give the testimony objected to. According to that testimony, the renewal receipt was refused by the deceased, with the result that the continuance of the insurance which it was to evidence never became effective.

[3, 4] At the request of the defendant the court gave to the jury the following charge:

"The delivery of the renewal premium receipt or certificate in this case was merely an offer by the insurance company to the insured to enter into a new contract continuing for another year, from September 21, 1914, the insurance that was about to expire, and this offer raised in the insurance company no liability to indemnify the insured against accidents until it was accepted, and, if it was refused when tendered by the agent of the company, such refusal would be presumed to continue, and, unless the insured changed his mind and decided to take it before the expiration of the policy, there would be no existing policy."

What was stated in this charge is not open to criticism, except possibly the part of it which required a decision of the insured to continue the insurance to be made before the expiration of the policy. The plaintiff could not have been prejudiced by that part of the instruction, as there was no evidence tending to prove that Brawner changed his mind and decided to accept the renewal receipt or certificate after the expiration of the insurance which was in force at the time the instrument came into his possession.

Other questions presented for review are not such as to call for discussion. The conclusion is that the record does not show the commission of any reversible error.

The judgment is affirmed.