RUSHER RICH and FLUSHER RICH, both minors, by their next friend, IRWIN CAUTHEN, CLINTON RICH, SPRUCE RICH, and GALLERY RICH, v. HERBERT B. HUNTER, as Executor of the last will and testament of A. RICH, Deceased, and HERBERT B. HUNTER, individually, and HERBERT W. HARDMAN, and CLARA M. HARDMAN, his wife.

185 So. 141

Division B.

Opinion Filed December 7, 1938.

Rehearing Denied December 28, 1938.

*Giles F. Lewis* and *Harry P. Johnson,* for Appellants;
*C. Rogers Wells,* for Appellees.

PER CURIAM.—This appeal is from an order revoking an order authorizing plaintiffs to file interrogatories, from an order denying a motion to allow introduction of further testimony, and from the final decree, dismissing the bill and awarding the property to the defendants.

The bill of complaint was instituted by the five children of A. Rich, deceased, two of them being minors and suing by their next friend, who were alleged to be the sole and

only surviving heirs at law of A. Rich, deceased. The bill prayed that the proceedings to dispossess plaintiffs of their property be stayed; that a receiver be appointed to take charge of the property; that Herbert B. Hunter, as Executor of the last will and testament of A. Rich, deceased, deliver to the receiver, funds in his hands as shown by his petition filed before the County Judge of Lake County; that Herbert B. Hunter account for the fruit picked from the property for the 1935-1936 season; that the deed from A. Rich to Herbert W. Hardman and Clara M. Hardman, his wife, be declared void and cancelled of record and for general relief.

The bill of complaint was predicated upon the theory that "Herbert B. Hunter conceived the fraudulent scheme and plan of fraudulently acquiring title to" the property involved. The bill alleged in substance that A. Rich died in Ocala, on June 6, 1936, seized and possessed of certain described real estate in Lisbon, Lake County, Florida, containing approximately ten acres, which he had occupied as his homestead; that said property descended to plaintiffs as the sole surviving heirs at law of deceased; that A. Rich acquired title to said property February 12, 1912, and occupied it continuously as a homestead until his death. and plaintiffs have continued to occupy it since then as a homestead; that A. Rich and his wife Rosa Rich "were ignorant and unlearned and aged" negroes, and Herbert B. Hunter "is a shrewd, young, white business man, and is possessed of a pleasing personality," and that the latter by "undue influence, importunities, persuasion, false and fraudulent representations" procured from A. Rich and his wife two options to purchase said property, gaining for Hunter "an unfair and unconscionable advantage" over A. Rich and his wife; that Rosa Rich could read a little and had a keener mind than A. Rich; that after the death of Rosa Rich, on November 17, 1934, Herbert B. Hunter, knowing of the

feebleness and ignorance of A. Rich, and having exclusive options to purchase said property at a fraction of its true value, had A. Rich sign a deed, without consideration, conveying said property to Herbert W. Hardman and wife, Clara M. Hardman; that Hardman is an uncle of Hunter and the Hardmans hold said property in trust for Hunter; that Hunter had prepared and had signed by A. Rich, a will, making Hunter executor; that during the 1935-1936 season. Hunter picked the citrus crop from said property, amounting to 1000-1500 boxes, which should have been worth $1200.00-$1500.00, and has not accounted for the same; that the Hardmans and Hunter have instituted, in the Circuit Court of Lake County, suit for forcible or unlawful detainer, or both, to recover possession of the property; that about seven acres of the property is citrus grove and it is necessary that a receiver be appointed to cultivate it and market the fruit.

An amendment was filed to the prayer, asking that the two options on the property obtained by Herbert B. Hunter from A. Rich and wife be decreed to be void and cancelled of record.

The bill was further amended by adding an allegation that in obtaining the deed to the property, Herbert B. Hunter was not acting for himself, but was acting as agent of the Hardmans.

The Hardmans filed an answer to the bill of comlaint; and Hunter, in his individual and representative capacities, filed a separate answer to the bill.

On October 7, 1936, A. S. Clark was appointed receiver of the property, upon his giving a bond for faithful performance and he was ordered to make all reports required by statute and rule of court, and to make no expenditure for fertilization or cultivation without approval of the court. On February 26, 1937, the report of the receiver was ap-

proved, certain expenses were ordered paid to him, and he and his bond both ordered discharged.

On December 28, 1936, and on January 8, 1937, testimony was taken before the Hon. J. C. B. Koonce, Circuit Judge.

On January 12, 1937, the court entered an order granting plaintiffs permission to file interrogatories for discovery by defendants of facts and documents material to the support of plaintiffs' cause of action.

On the following day, the interrogatories were propounded by the plaintiffs.

On the next succeeding day, January 14, 1937, the judge ordered that the order allowing plaintiffs to file interrogatories be revoked because "said interrogatories, if answered, have no probative effect."

On the following day, January 15, 1937, plaintiffs asked for permission to introduce further testimony in the cause, and to be allowed a reasonable time, to be set by the court, in which to do it.

On the same date, the court denied this motion, and allowed plaintiffs to amend their bill of complaint, and allowed the answers already filed to stand to any amended bill that might be filed.

The defendants moved that the court enter final decree in the cause. Whereupon, the court entered final decree, dismissing the bill of complaint, but retaining jurisdiction to enter any orders regarding costs and the receivership, ordering that the Hardmans or their duly authorized representatives or agents be put into full possession of the property, and requiring the receiver to make a full report of his receivership.

All of the testimony at the hearings was introduced by the plaintiffs, there being no attempt on the part of the defendants to introduce any testimony at all. The testimony in-

troduced was not contradicted, and tends to show that A. Rich was not mentally capable of handling his own affairs.

True Adams, a negro, who lived about a mile and a half from A. Rich, testified that beginning with the bank closing in March, 1933, A. Rich kept getting worse mentally, and that after his wife died he practically lost his mind; that he once relieved his kidneys on the public streets of Leesburg; that he was never completely right during his last few years; that once witness went to pay A. Rich for the hire of a mule, and Rich did not remember the transaction; that later in the conversation Rich pulled out of his pocket, the money that had been paid him, and wanted to know where it came from; that Rich then came to himself and remembered being paid.

Milton Wright, another negro, about 65 years old, gave the following testimony:

"Q. Did you see him do anything, or hear him say anything, except that, that made you believe his mind was not right?

"A. Yes, sir. I told him one day that I wanted to get his mule tomorrow, on Saturday. He says, 'All right.' I went over there early in the morning to get the mule. I called him and he come out and told the young boy to go hitch up the mule. The boy brought the mule to the house and he come to the door again, and said 'Have you done your plowing?' I says, 'No, I haven't started yet; I am fixing to start.' He said, 'I didn't know. My mind is bad sometimes. I thought you had done a day's work and brought the mule back.' That was early in the morning about 7:30. He said, 'Sometimes I am just about crazy.'

".Q Did you hear him say anything else, or do anything else, that made you think his mind was not right?

"A. Sometimes me and him would be talking, and he would ask me something and I would tell him as best I could, and maybe in 25 or 30 minutes he would ask me the same

question over again. I would say, 'I told you that not long ago,' and he would say, 'You did? I forgot it. I have not much mind now.' "

There was testimony to the effect that A. Rich seemed to have a lot of confidence in white people, and that he could be easily influenced by any one in whom he had confidence.

C. T. Edwards, a negro preacher, testified as follows:

"Q. From what you saw of him (A. Rich) from 1934 until his death, would you s iy during that period of time he was able to comprehend the property he had the ordinary distribution of it—in other words could he in his mind figure out what he had and what he wanted to do with it?

"A. No, sir; I don't think he could. I couldn't see anything in him as a man who showed any business along that line. I didn't know of his qualifications. I found him out in the field. I told him I wanted him to qualify as a special man who had money as trustee; and I had to have money, and I said, 'I selected you myself,' and he agreed with it, and rejected it within the next fifteen or twenty minutes."

E. Rich, a son of A. Rich, and half brother of plaintiffs, testified as follows:

"A. * * * He had an old cow out there and she got out. I went out there one evening and he said he was going to kill her. I said, 'Give her to me.' He said, 'All right, you can have her.' I got a bunch of the boys and we carried her home. Two or three weeks after that Ed. Register went out there and gave him $5.00 for the cow. He come after the cow and I asked him, 'What do you (want), he gave me the cow.' Then he got old man Rich and he come back, and he didn't know about it. He had a time getting the $5.00 back. I knowed then that he didn't have good sense.

"Q. How long was that before he died, do you remember?

"A. That was a year before.

"Q. That was in 1934?

"A. Yes, sir.

\* \* \* \* \* \* \*

"Q. Were you at A. Rich's place when some Gypsies came there?

"A. Yes, sir.

"Q. Tell the court what happened?

"A. They came there and told him they wanted to tell his fortune. He gave them $50.00, and the little boy had $35.00 and he got that, and all of his daughter's clothes and gave them.

"Q. Who were they, men or women?

"A. Two white men and two white ladies. He said he didn't know anything about it, that he gave it to them.

"Q. Did you see him give it to them, the money?

"A. Yes, sir. I come up at the time he gave it to them.

"Q. How long was that before he died?

"A. That was along March of this year.

"Q. Before he died in May?

"A. Yes, sir."

There was testimony of fruit buyers, who picked the 1935-1936 crop of citrus from the property of A. Rich, to the effect that they purchased the fruit from Herbert B. Hunter, under the representation that Hunter had leased the property.

The record shows that on December 26, 1928, A. Rich and wife, Rosa Rich, executed to Herbert Hunter, for a consideration of $25.00, a five year option to purchase the property for $2500.00, if the owners decided to sell within that time, with the privilege to Hunter of renewing the option on the same terms at the end of the five year period. The record also shows that on January 9, 1933, the same parties, for a consideration of $75.00, executed a ten year option to purchase the property for $1500.00, with the

privilege to Hunter of renewing the option at the end of the ten year period, on the same terms. There was testimony that the property contained about ten acres, seven of which were set out in citrus trees. Various witnesses testified that the trees were becoming more valuable as they grew larger; and the witnesses placed the value of the property at $3,-000.00-$3,500.00, and one witness placed it at $5,500.00. The record shows that the deed of the property from A. Rich to Herbert W. Hardman and Clara M. Hardman, which was executed November 26, 1934, recited $10.00 and other valuable considerations, and contained only $1.50 worth of Florida documentary stamps, and $1.50 worth of Federal documentary stamps. The testimony also shows that in 1933, after the second option had been given but before the deed to the property was executed, A. Rich built a $400.00 house on the property. There was testimony showing that Hunter sold the 1935-1936 crop of fruit, representing that he had leased the property.

The evidence tends to show that A. Rich did not have enough mentality to deal with his own property. Whether fraud on the part of Hunter was actually proved, we do not now determine, but there are peculiar circumstances that were not explained.

Testimony was taken on December 28, 1936, and on January 8, 1937, at which times plaintiffs introduced all of the testimony. None of the defendants testified. A. Rich, the grantor, was deceased. After granting plaintiffs permission to propound to the defendants stated interrogatories, the circuit judge then revoked the permission on the ground that the interrogatories, if answered, have no probative value. Then plaintiffs asked for further time in which to introduce testimony, so that they might get testimony of the defendants on certain pertinent matters in regard to the transaction, which motion was denied. The cause was not

at issue until the answers were filed on December 8, 1936. The motion to allow plaintiffs to introduce further testimony was denied on January 15, 1937, although not filed until January 18, 1937, about 38 days after the cause was at issue.

Section 46 of the 1931 Chancery Act, Sec. 4921 (2) C. G. L. Perm. Supp. 1936, provides in part:

"In the absence of any order by the court extending or limiting the time otherwise, three months from the time a cause is at issue and no longer shall be allowed for the taking of testimony in any cause, *unless the cause has been set for trial before the court.* The time for taking testimony may be extended by special order of the court in its discretion or by written stipulation of the parties filed in the cause, or by oral stipulation evidenced by the record." (emphasis supplied).

This was an amendment of Equity Rule 71, which provided in part:

"In the absence of any order by the judge extending or limiting the time otherwise, three months from the time a cause is at issue and no longer shall be allowed for the taking of testimony in any cause including causes proceeding *ex parte.*"

This statute, Sec. 4921 (2) C. G. L., contemplates that in hearings had before masters in chancery, it is in the discretion of the chancellor, to set the time within which the parties must introduce their evidence; but in the absence of an order by the chancellor fixing the time, three months is allowed, unless the time is extended by an appropriate order. Where, however, the case has been set for trial before the chancellor, the statute contains no express limitations on the matter of time for taking testimony. Where testimony is taken before the chancellor, the statute contemplates that when all testimony has been taken before three months' time has elapsed, the chancellor has discretionary power to end

the hearing and enter final decree; but this discretionary power does not give him the right to end a hearing and enter final decree, while one of the parties has pertinent evidence, possessing probative value, to be introduced, without first giving that party a reasonable time in which to introduce his evidence. In a case in which the evidence was heard by the chancellor, and less than three months' time had elapsed, and where the record affirmatively shows that there was additional testimony to be taken on material points, possessing probative value, the chancellor, in refusing to allow interrogatories to be propounded or answered on these material points, and in refusing to allow additional reasonable time in which to admit such material testimony, did, under the circumstances, commit error.

Our statute, Sec. 4372 (2705) C. G. L., provides in part:

" * * * that no party to such action or proceeding, nor any person interested in the event thereof, nor any person from, through or under whom any such party, or interested person, derives any interest or title, by assignment or otherwise, shall be examined as a witness in regard to any transaction or communication between such witness and a person at the time of such examination deceased, insane or lunatic, against the executor, or administrator, heir-at-law, next of kin, assignee, legatee, devisee or survivor of such deceased person, or the assignee or committee of such insane person or lunatic; but this prohibition shall not extend to any transaction or communication as to which any such executor, administrator, heir-at-law, next of kin, assignee, legatee, devisee, survivor or committeeman shall be examined on his own behalf, or as to which the testimony of such deceased person or lunatic shall be given in evidence."

Under the rules of the common law all persons who were interested in the event of a suit were disqualified from testifying therein, whether their adversaries were living or

dead. The purpose of Sec. 4372 (2705) C. G. L. was to remove the common law disability arising from interest, except where one of the parties to a transaction or communication was, at the time of the hearing, dead, insane or a lunatic. In those cases the disabilities arising from interest, imposed by the common law are retained by the statute; but the statute disqualifies those only who were disqualified by the common law. Adams v. Board of Trustees of I. I. Fund, 37 Fla. 26, 20 So. 266. This statute was designed to enlarge the common law rule, except as to transactions and communications between interested parties and persons deceased, insane or lunatic. Le Blanc v. Yawn, 99 Fla. 328, 126 So. 789.

In the case of Catlett v. Chestnut, 117 Fla. 538, 158 So. 418, we said:

"The bar of the common law that disqualified a witness on account of his interest in the result of a cause is preserved in part by Section 4372, C. G. L., *supra*. It is not lifted by a mere invocation of the procedure authorized by Sections 4406, 4407, C. G. L., *supra*, on behalf of an executor, administrator, heir-at-law, next of kin, assignee, legatee, devisee, survivor, or committeeman *unless the answers taken on the interrogatories are offered in evidence in the case against the party disqualified.*" (emphasis supplied).

Again in the case of McMullen v. St. Lucie County Bank, 128 Fla. 745, 175 So. 721, this Court, speaking through Mr. Justice TERRELL, said:

"Even if Marvel had still owned his stock in the bank, he was not disqualified to testify because *he was not a witness against* the 'executor, or administrator, heir-at-law, next of kin, assignee, legatee, devisee or survivor of such deceased person,' these being the persons and classes protected under the statute (Section 4372 Compiled General Laws of 1927, *supra*). Browner v. Royal Indemnity Company (C. C. A.)

246 F. 637; Goldschmidt v. Mutual Life Insurance Company of New York, 134 App. Div. 475, 119 N. Y. S. 233; Lanter v. Southern States Life Insurance Company of Alabama, 114 S. C. 536, 104 S. E. 193; Savage v. Modern Woodmen of America, 84 Kan. 63, 113 P. 802, 33 L. R. A. (N. S.) 773.

"In New York, where our statute affecting the qualification of witnesses to testify as to transactions between them and one deceased originated, it is held that *an executor may waive such disqualification* by testifying himself as to such matters or by cross-examining the opposite party as to them. Hackstaff v. Hackstaff, 82 Hun. 16, 31 N. Y. S. 11; In re Cozine, 104 App. Div. 182, 93 N. Y. S. 557; King's County Trust Company v. Hyams, 242 N. Y. 405, 152 N. E. 129." (emphasis supplied).

Under the interpretations given this statute, both by the New York Courts where the statute originated, and by the Florida courts where it was adopted, certain enumerated classes of persons, among whom are heirs-at-law, are protected by the statute, Sec. 4372 (2705) C. G. L., to the extent that a party interested in the event of a suit is not permitted to testify *against* them concerning any transaction or communication had with their deceased ancestor (or other class named by the statute). This protection is for the particular benefit of the classes named in the statute. However, if they so desire, they may waive this protection either by testifying themselves on the subject, by cross examining the opposite party on the subject, or by any other conduct on the part of the class protected by the statute, evidenced in the record, clearly indicating that they, knowing their rights under the statute, wished to waive the protection afforded thereby.

The final decree is reversed and the cause remanded for appropriate proceedings.

322

It is so ordered.

WHITFIELD, P. J., and BROWN and CHAPMAN, J. J., concur.

TERRELL, C. J., and BUFORD, J., concur in the opinion and judgment.