ESTELLA A. THOMPSON, by Thomas G. Thompson, her husband, as her next friend v. ED W. HARRIS and FRANK HARRISON, as Administrators of the Estate of Fred W. Adams, deceased, and ROSE B. ADAMS, an unmarried woman.

4 So. (2nd) 385
En Banc
Opinion Filed October 24, 1941
Rehearing Denied November 13, 1941

*C. I. Carey,* for Appellant;

*Ed. W. Harris,* Attorney for Rose B. Adams, Ed. W. Harris, in his own proper person as Administrator of the Estate of Fred W. Adams, Deceased, *Frank Harrison* in his own proper person as Administrator of the Estate of Fred W. Adams, Deceased, for Appellees.

CHAPMAN, J.—The sole question presented by this appeal for a decision here is the sufficiency of the evidence to show a common law marriage between Rose B. Adams and the deceased, Fred W. Adams. The chancellor below was of the view, and so decreed, that the testimony clearly established a common law marriage between the parties.

Common law marriages are recognized and sustained by the laws of Florida. See Mendel v. Mendel,

147 Fla. 167, 1 So. (2nd) 571; Orr v. State, 129 Fla. 398, 176 So. 510; Garcia v. Exchange Nat. Bank, 123 Fla. 726, 167 So. 518; Catlett v. Chestnut, 107 Fla. 498, 146 So. 241, 91 A.L.R. 212; LeBlanc v. Yawn, 99 Fla. 328, 126 So. 789; Chaves v. Chaves, 79 Fla. 602, 84 So. 672; Madison v. Robinson, 95 Fla. 321, 116 So. 31; Warren v. Warren, 66 Fla. 138, 63 So. 726; Caras v. Hendrix, 62 Fla. 446, 57 So. 345; Daniel v. Sams, 17 Fla. 487.

The testimony shows that Fred W. Adams, widower, seventy years of age, during the latter part of 1938, was living in an apartment in St. Petersburg, Florida, and during the month of December met Rose B. Ferlong, widow, sixty-three years of age, and from this acquaintance date they were together practically each day until the death of Fred W. Adams, which occurred June 16, 1939, in Pinellas County, Florida. He died intestate and his estate was inventoried at the approximate sum of $22,000.00. In a petition for Letters of Administration she designated herself as the widow of the late Fred W. Adams and Letters Testamentary issued.

Prior to April 2, 1939, Fred W. Adams and Rose B. Ferlong lived in separate apartments in St. Petersburg, when Fred W. Adams bought a house and lot and both of them moved into the house and there lived until April 16, 1939, when the parties decided to marry. They went into the sitting room, with no one else present, where they knelt down, according to the testimony of Rose B. Ferlong, and took the following obligation:

". . . We knelt down there and he said: 'I, Fred Adams, take thee, Rose Ferlong, to be my lawful wedded wife, for better or worse, and to keep you in

sickness and in health, until death do us part,' and I repeated the same thing. And he placed this ring, he said, 'With this ring I thee wed and endow thee with all my worldly goods until death do us part in the name of the Father, the Son and the Holy Ghost.' "

The relation of husband and wife, according to her testimony, existed from and after the date of the ceremony until the death of Adams some sixty days thereafter.

The purchase of the home was published in the St. Petersburg newspapers and the parties were referred to in the articles as husband and wife. Friends of the couple played cards weekly with them in their respective apartments and later in the home to which they moved around April 2, 1939, and testified that they were husband and wife, but each was without knowledge or information as to the existence of or the date of the marriage. There is indisputable testimony in the record as to cohabitation by the parties after April 2, 1939, but the actual marriage ceremony rests on the tetsimony of Rose B. Ferlong given after death closed the lips of Fred W. Adams, the owner of the $22,000.00 estate. If the common law marriage is sustained, she will profit to the extent of a lawful interest in the Adams' estate as the wife of the deceased.

In the case of Madison v. Robinson, 95 Fla. 321, 116 So. 31, this Court held that the details of a conversation relied upon to sustain a common law marriage had between an interested witness and a person then deceased constituted a transaction within the inhibitions of Sections 4372 C.G.L. This rule was reiterated by this Court in the cases of LeBlanc v. Yawn, 99 Fla. 328, 126 So. 789, and Catlett v. Chestnut,

107 Fla. 498, 146 So. 241. It is contended by appellee that these inhibitions were waived or removed by the appellant when she made Rose B. Ferlong her witness and the exception enunciated in Rich v. Hunter, 135 Fla. 309, 185 So. 141, and Smith v. Platt, 128 Fla. 745, 175 So. 721, are cited as controlling. The case at bar can be decided without ruling on this contention.

Some nine months after the date of the death of Fred W. Adams and prior to the date of the institution of the suit at bar and while Rose B. Ferlong was Administratrix of the Adams' Estate, she wrote a letter to the appellant and same during the trial of the cause was by the planitiff below (appellant here) offered in evidence as Plaintiff's Exhibit "F", and was duly considered by the chancellor below. Pertinent and material statements concerning her alleged marriage with Fred W. Adams, appear in this letter above the signature of "Rose B. Adams" (Rose B. Ferlong) and are viz:

". . . Last March Fred asked me to marry him and I promised him I would. We decided we wanted to spend the rest of our lives in Florida, so I adopted it as my permanent home, as Fred was a legal resident & votes here. I brought my things to the house and Fred brought his, then we shopped around for the rest of the furniture, we stayed at our new home, because there was so much to be done. We had been here about two weeks when a picture of the house appeared in the papers saying 'New Adams residence' purchased by Mr. & Mrs. Fred W. Adams as their permanent home. Almost at once friends of Fred called to see the house and meet his wife, thus a situation was thrust upon us over which we had no control.

Our intention was to fix the house and have the yard laid out grassed & the shrubs put in, and then get married, go on a short trip, come home and enjoy our home, which we both loved as everyone thought we were already married, we decided to let it stand, so we took the marriage vows ourselves, and Fred placed our ring on my finger, and to God we consecrated our vows before God and the world I am Fred's wife, known as such to everyone. We intended to go North, and on the way planned to legalize our marriage, but before we could do so my dear one was taken from me, he had a stroke, as we were returning home from a fishing trip . . . I am appealing to you, through your love for him to let his memory remain sacred and unsullied because of circumstances over which we had no control. . . ."

When on the witness stand her attention was directed to the above statement and an effort was made on her part to explain, alter or modify the same. We have carefully examined and followed her testimony incident thereto given on direct and cross examination. Her interpretation of the language employed or used in the letter, *supra,* when on the witness stand is not convincing, but is contradictory, self-serving, and but her opinions and conclusions: "We intended to go North and on the way we planned to legalize our marriage, but before we could do so my dear one was taken from me" and thus "I am appealing to you through your love for him to let his memory remain sacred and unsullied because of circumstances over which we had no control." It will be seen from these statements that Adams died prior to their contemplated trip when they intended to have performed a ceremonial marriage. The record dis-

closes that Fred W. Adams and Rose B. Ferlong had been previously married; both were familiar by experience with the law's requirements as to marriage, and it is reasonable to assume that a marriage license and an officer authorized by law to solemnize marriages could have been obtained in the City of St. Petersburg within a few minutes by the parties if they truly desired to become husband and wife. Fred W. Adams because of death was never given an opportunity to testify in the case at bar.

In a common law marriage the parties may express their agreement by parol or enter into such a ceremony as may satisfy their taste or tastes, because it is the agreement reached that makes the marriage contract. The words used or the ceremony performed is the evidence of intention of the parties to become husband and wife. The law requires that the parol agreement to become husband and wife contemplates an immediate cohabitation by the parties. An expressed future condition is fatal to a claim of marriage, and cannot be explained away by circumstances. The future condition discloses a mental reservation incompatible with consent. The letter *supra* disclosed an intention of the parties to legalize their marriage on a contemplated trip North, but prior thereto Adams died. The testimony shows that the case at bar is ruled by Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156. The testimony adduced was legally insufficient to establish a common law marriage and for this reason the decree appealed from is hereby reversed.

It is so ordered.

WHITFIELD, THOMAS and ADAMS, J. J., concur.

BROWN, TERRELL and BUFORD, J. J., dissent.

BROWN, C. J., dissenting.—In the third and fourth paragraphs of the chancellor's decree the following very pertinent findings of fact and observations upon the evidence in the case were made:

"3. That when the defendant, Rose B. Adams and Fred W. Adams, in the privacy of their home, took the marriage obligation and vows as shown by the testimony, they then and there became husband and wife and that thereafter until the time of the death of Fred W. Adams these parties lived happily together as husband and wife; that from the time said marriage obligations and vows were taken by Rose B. Adams and Fred W. Adams and up to and including the time of the death of Fred W. Adams, their neighbors, friends and acquaintances understood and believed them to be husband and wife; that in addition to holding themselves out to the public as husband and wife the said Fred W. Adams further recognized said marriage to Rose B. Adams by attempting during his lifetime to make a will leaving all of his property to his wife, Rose B. Adams, but said will was ineffectual because it was defectively executed."

"4. That when the defendant, Rose B. Adams, stated in the letter to the plaintiff, 'we intended to go north and on the way planned to legalize our marriage but before we could do so my dear one was taken from me' she was speaking as a lay woman and as such she meant that these parties intended only to formalize their marriage so that she could have something in writing in the form of a marriage certificate, but that both Mr. and Mrs. Adams clearly understood that they were married and actually husband and wife, from the time when they took the marriage

obligation and vows and from that time forward to the time of his death they were actually husband and wife as fully as though they had had a marriage ceremony performed by a minister, notary public or other official entitled to perform such ceremony; that Fred W. Adams was a man approximately 70 years of age and Rose B. Adams was a woman of about 63 years of age at the time of the marriage, and for this reason among others, the Court is impressed with the fact that these parties were not living, and did not intend to live, in a clandestine or secretive manner, but on the contrary each of them was desirous of the companionship of the other and for that reason they selected and he purchased, and they furnished, a home in which they intended to and did reside as husband and wife for the remainder of their joint lives."

I think these findings of fact and conclusions of the chancellor are sustained by the record in this case. The letter referred to as an attempt to make a will, reads as follows:

"If anything should happen to me suddenly, all I have is yours. The paper which I showed and explained to you recently tells you of all my possessions and this home which we planned together here at 760, including car is yours also. Our life is beautiful, and I love you deeply. Your care and devotion to me is more than I ever dreamed could come to me. I am most happy, in fact as I've told you many times, happier than I have ever been in my whole life. I write this because I feel that I am not as well as I have been if anything should happen, this letter will be found with my other papers, as my beloved wife,

338

and only living heir, you will not have any difficulty in securing my estate at my death."

In the case of LeBlanc v. Yawn, 99 Fla. 328, 126 So. 789, this Court held, that:

"The mere fact that a ceremonial marriage was discussed between parties to a common law marriage is not inconsistent with the prior common law marriage of the said parties, nor does it overcome the presumption thereof arising from proof of the common law marriage."

For these reasons I think the decree appealed from should be affirmed.

TERRELL and BUFORD, J. J., concur.