DAISY ORR, alias DAISY THOMPSON, v. STATE.

176 So. 510.
Division B.
Opinion Filed October 9, 1937.

*Shannon Lining, Jr.,* for Plaintiff in Error;

*Cary D. Landis,* Attorney General, and *Tyrus A. Norwood,* Assistant Attorney General, for the State.

CHAPMAN, J.—On October 27, 1936, the County Solicitor of the Criminal Court of Record in and for Duval County, Florida, filed an information charging plaintiff in error with the crime of accessory after the fact and the information is viz.:

"IN THE CRIMINAL COURT OF RECORD, of the County of Duval and State of Florida, October Term, in the year of our Lord one thousand nine hundred and thirty-six.

"INFORMATION FOR ACCESSORY AFTER THE FACT.

"STATE OF FLORIDA v. DAISY ORR, alias DAISY THOMPSON.

"IN THE NAME AND BY AUTHORITY OF THE STATE OF FLORIDA, L. D. HOWELL, County Solicitor for the County of Duval, prosecuting for the State of Florida in the said County under oath, information makes that Daisy Orr, alias Daisy Thompson of the County of Duval and State of Florida, on the twenty-fifth day of September, in the year of our Lord one thousand nine hundred and thirty-six, in the County and State aforesaid, then and there not standing in

the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister by consanguinity or affinity to one Nathaniel Thompson, alias Nathan Thompson, she the said Daisy Orr, alias Daisy Thompson, then and there well knowing that the said Nathaniel Thompson, alias Nathan Thompson, had before that, on, to-wit: the third day of September in the year of our Lord one thousand nine hundred and thirty-six, in the county and State aforesaid, had committed a felony under the laws of the State of Florida, to-wit: that the said Nathaniel Thompson, alias Nathan Thompson, at the time and place aforesaid, had murdered one Raymond Perry, she, the said Daisy Orr, alias Daisy Thompson, with the intent that the said Nathaniel Thompson, alias Nathan Thompson, should avoid and escape detection, arrest, trial and punishment, did then and there, unlawfully maintain, assist, help, comfort, counsel, advise, encourage, sustain, support and harbor the said ·Nathaniel Thompson, alias Nathan Thompson,"

Endorsement on back of information:

"contrary to the form of the statute in such case made and provided, and against the peace and dignity of the State of Florida.

"L. D. HOWELL,

"County Solicitor, Duval County, Florida."

The above information is drawn under Section 7112 C. G. L. of Florida, viz.:

"ACCESSORY AFTER FACT. Whoever, not standing in the relation of husband or wife, parent or grandparent, child or grandchild, brother or sister, by consanguinity or affinity to the offender, maintains or assists the principal or accessory before the fact, or gives the offender any other aid, knowing that he has committed a felony or been accessory thereto before the fact, with intent that he shall avoid or

escape detection, arrest, trial or punishment, shall be deemed an accessory after the fact, and be punished by imprisonment in the State prison not exceeding seven years, or in the county jail not exceeding one year, or by fine not exceeding one thousand dollars."

On October 31, 1936, defendant was arraigned on said information and entered a plea of not guilty. The suit was set for trial on January 18, 1937, when the respective parties appeared with counsel and after hearing the evidence, argument of counsel, and charge of the court upon the law on the 20th day of January, 1937, the jury returned a verdict of guilty. When a motion for a new trial was overruled and denied the court below sentenced the defendant to the State Prison for a period of three years. An order was entered settling the bill of exceptions and writ of error sued out and the cause brought to this Court for review with 35 assignments of error. It is not necessary to consider each of these assignments for the purpose of deciding this cause.

It is the contention of counsel for plaintiff in error that the State of Florida failed and otherwise omitted to prove and establish that the plaintiff in error was not the wife of Nathaniel Thompson. The information, *supra,* charges and the burden of proof rests upon the State of Florida to show that the relation of husband and wife did not exist bewteen plaintiff in error and Nathaniel Thompson. This question is squarely raised by counsel for plaintiff in error and is the pivotal point in this suit. The plaintiff in error is a colored woman and asserts she was on or about September 3, 1936, the common law wife of Nathaniel Thompson, who was a fugitive from justice charged with the murder of a Mr. Perry on the aforesaid date and who was later arrested and convicted. The evidence offered by the State

to establish the relationship of husband and wife did not exist is as follows:

Testimony of S. L. Hurlbert, County Detective:

"On cross, Hurlbert testified that:

"Daisy told me that she was not married to Nathaniel, that Nathaniel had put her out of the house. She told me that on the day that Nathaniel killed Perry; and that same day she told me that Nathaniel put her out of their house three days before the killing and put another woman in. I have been knowing Nathaniel for 17 years, but I don't know anything about Daisy.

"Q. You don't—anything about Daisy?

"A. No, sir, not until that day (day of the killing). I know that Nathaniel Thompson has got a wife down the State, a wife and boy. I knew nothing about the married life of Nathaniel and Daisy—if they were married or not— before I went out to Dinsmore to investigate the killing, on. Sept. 3, 1936. At that time some woman named Smith was living in the house with Nathan. When I went out there I found out that Nathan had put Daisy out of the house two or three days before."

Also Gene Griffin, Deputy Sheriff:

"* * * That was the day of the killing of Perry. I went to the house with the other officers—B. Sweat was with me in my car—and it seems that Daisy had been living with Nathaniel up until just a short time before this, he had thrown her out, and run her out, and she was staying down there with some of her relations, and we talked to her and tried to find out all the information we could.

"* * * Daisy was in contact with him and spent part of the night or all night with him out at Lanier's house. And the morning that we arrested Nathaniel at Lanier's house,

we found Daisy there with him in the house. We had contacted and talked to Daisy between Monday of that week and the Saturday following when we arrested them; and during that time she had given us no information as to the whereabouts of Nathaniel. And she admitted to me later that she had spent part of the night there with him previously, previous to the time she was arrested there with him. I did not know either Nathan Thompson or Daisy Orr, alias Daisy Thompson, before the killing of Mr. Perry by Thompson."

Also R. G. Barker, Deputy Sheriff:

"* * * When we arrested Nathaniel at a place about 12 miles from where Daisy lived, we found Daisy with him in the house. I did not know either Nathaniel Thompson or Daisy Orr before September 3rd, the day of the killing.

Also Hal Jacobs:

"* * * I do not know anything concerning the married life of Daisy Orr and Nathaniel Thompson."

Also Ella Mungen:

"I know both Daisy Orr and Nathaniel Thompson; I raised him from a boy. I know both his father and mother.

"Q. (by State). Was this woman, Daisy Orr, Nathaniel Thompson's parent or grandparent; was she his father or mother; was she his grandmother; was she his child; was she his grandchild; was she his sister; neither by blood or marriage?

"A. (Severally). No, sir.

"Cross Examination by Mr. Lining, defendant's attorney:

"Q. Is Daisy Orr, alias Daisy Thompson, the wife of Nathaniel Thompson?

"Mr. Crews (for the State): Just a minute; I object to that question, on the ground it is not in cross of anything brought out by the State. We have studiously avoided asking any question as to any relation of husband and wife. The State objects to that question, on the ground it is not proper on cross.

"Mr. Lining: Your Honor, the Information affirmatively says that Daisy Orr, alias Daisy Thompson, is not the wife of Nathaniel Thompson, and that is the issue in the case. I think it is relevant and material; what this witness knows is proper. If Daisy Orr is the wife of Nathaniel Thompson, under the Florida law, I would contend that she is absolved from any accessory charge.

"The Court: I think it is material; the objection, however, is to the point that that testimony is not in cross examination of anything brought out by this witness, and I think the objection is well taken * * *"

The same witness was called in behalf of the defendant and testified, viz.:

"Q. Did you know that Nathaniel married Daisy?

"A. No, sir. I know that he lived with her; he said that he took her as his wife; she said that she took him as her husband. As far as I know, they were recognized around there as man and wife. I did recognize them as man and wife. When he brought her there to us, he said, 'Here is my wife.' As far as I know Daisy seemed to be his wife, she act like one. When they first started living together they come to live in my house, and they stayed with me about a year. Then they moved across the branch, where that old house used to sit. Then they moved to the Byrd farm. Then later they had a house of their own—that new house Nathan built. Daisy lived there with him, for his wife. They lived there about three months, then

Nathaniel brought Dorothy May Smith in on a Tuesday night. I am sure that it was Tuesday night, because the other happened on Thursday. Daisy knew that that girl was brought in there Tuesday night; she was right at my house when he brought her.

"Q. Did anyone in the neighborhood ever dispute the fact that Daisy and Nathan were man and wife?

"A. No.

"Q. In other words, did they say they weren't married? Did anybody else say that?

"A. She said it herself. Daisy said that she wasn't married to Nathan; she said it often and often. I don't know why she said it; when they got mad, that's what she would say. Yes, she was living with him at the time she said it. She didn't get mad at Nathan often. In a way I did recognize Daisy and Nathan as man and wife and in a way I didn't. I knew they lived together for four years. Plenty of times they had arguments. And when they had arguments she would tell him, 'That is all right, he would see it again.' It was then that she would say that she was not his wife."

Nathaniel Thompson and Daisy Orr Thompson each testified that they agreed to marry and pursuant to the agreement began cohabitation. She took his name, went to live with him at the place he prepared and continued so to do at Dinsmore for about four years before her husband killed Mr. Perry at Dinsmore. They lived as husband and wife with Ella Mungen until they built a home and then moved into it—he obtained a life insurance policy with the Sewannee Life Insurance Company and she, as his wife, was made the beneficiary. He was sick for a long time and as his wife she cared for him—he made provisions for her as his wife in his will. It is true that friction and misunder-

standings arose between them from time to time. She was with him when arrested by the officers and appeared to be in communication while he evaded the officers. These facts are corroborated by Sylvester Lanier, Mrs. Maggie L. Andrews, Postmistress of Dinsmore, T. V. Carter, turpentine operator of that community, W. I. Anderson knew these facts to be true. These stubborn facts cannot be overlooked by this Court in the impartial administration of the law. It is true that a marriage license to marry was never obtained by the parties, neither was a ceremony performed as commonly recognized. Let us examine the law and decide from these facts if a common law marriage existed between Nathaniel Thompson and Daisy Orr Thompson during the month of September, 1936. If such a marriage existed then the judgment appealed from should be reversed. If such a marriage did not exist then the judgment appealed from should be affirmed.

The common law of England of a general and not of a local nature was adopted by the Legislature of Florida on November 6, 1829. See Section 87, Compiled General Laws of Florida. This Court in the consideration of this question in Quinn v. Phipps, 93 Fla. 805, text page 824, 113 Sou. Rep. 419, said:

"Our 'Anglo-American legal tradition' which we term the common law is primarily an English institution. It is not a fixed body of well defined rules embodied in the written records of this or the mother country, but is rather a method of juristic thought or manner of treating legal questions worked out from time to time by the wisdom of mankind. It is a doctrine of reason applied to experience. Its rules were promulgated in feudal times, an age of dense ignorance, crude customs and primitive society, when slight value was attached to life, liberty or property, when com-

merce was almost unknown and property was of little value. In the time of Henry II the King's courts became organized and from these local rules or customs began to evolve the common law. By the genius of Coke these rules or customs were remodeled into vital, pulsating principles and were passed on to the English Colonies in this country where they have by reason and interpretation attained their most complete logical develeopment. We are therefore more essentially a common law country than England herself."

Since the common law of England is a part of our system of laws, now let us determine the essential element of a marriage at the common law. In 38 Corpus Juris, page 1316, par. 89, we find:

"Essential Elements—a. In General. To constitute a marriage valid at common law, that is, in the absence of a statute otherwise specifically providing, it is not necessary that it should be solemnized in any particular form or with any particular rite or ceremony. All that is required is that there should be an actual and mutual agreement to enter into a matrimonial relation, permanent and exclusive of all others, between parties capable in law of making such a contract, consummated by their cohabitation as man and wife or their mutual assumption openly of marital duties and obligations."

Likewise Ruling Case Law, Vol. 18, pages 390-391, pars. 11 and 12, it holds:

"Validity of Common Law Marriage. In England it was long held that contracts of marriage *per verba de praesenti* were valid and it was not essential that any ceremony attend the creation of the relation; and that while the church elevated marriage to the dignity of a sacrament, it respected its natural and civil origin, and did not absolutely require

the intervention of a priest. However, in the year 1844, what had thus been regarded as a rule of a common law, as derived from the ecclesiastical law, was overturned by the House of Lords, which being equally divided on the question of the validity of a marriage *per verba de praesenti,* resolved it in the negative, and later the English marriage Act expressly rendered void marriages which were not solemnized in accordance with its provisions. In Canada and many of the states of this country the general view obtaining in England prior to the decision of the House of Lords, as to what was the common law of England, became the common law, but in a few of the states the courts have held for one reason or another that the so-called common law marriages are not valid. In some of these jurisdictions such marriages have been declared to be invalid on the ground that the common law in reference thereto never became the law of the jurisdiction, but that marriages have always been regulated by statute, and in others the common law of marriage was adopted by the courts, but was later abrogated by statutes.

"Marriage *per Verba de Praesenti* Generally. The two essentials of a valid marriage at common law are capacity and mutual consent, and it is well settled that under the common law the marriage relation may be formed by words of present assent, *per verba de praesenti,* and without the interposition of any person lawfully authorized to solemnize marriages, or to join persons in marriage. To constitute marriage *per verba de praesenti,* the parties must be in the presence of each other when the agreement is entered into, but it need not be made in the presence of a witness, though without witnesses it may be difficult to establish it. The parties may express the agreement by parol, they may signify it by whatever ceremony their whim or their taste or

their religious belief may select; it is the agreement itself, and not the form in which it is couched, which constitutes the contract; and the words used or the ceremony performed are mere evidence of a present intention and agreement of the parties."

These authorities are in accord with our holdings in Marsicano v. Marsicano, 79 Fla. 278, 84 Sou. Rep. 156; also LeBlanc v. Yawn, 99 Fla. 328, 126 Sou. Rep. 789.

The institution of marriage is the foundation of our republic. It establishes our homes and from them come our boys and girls today, who are in control of our public affairs, tomorrow. Pursuant to an agreement to marry is cohabitation, the founding of a home, affections and companionship, unconsciously we depend on each other during the changing vicissitudes of life. While it may have faults, it is commonly acknowledged to be the best plan created by the ingenuity of man. These colored people failed to obtain a license to marry or to have a ceremony performed in conformity with our law and customs, but the facts indicate a common law marriage. The admission, "We was clear to marry, but got no court house papers," should not militate against them here.

We think the facts in this suit should be passed upon by another jury and for this reason the judgment appealed from is reversed.

WHITFIELD, P. J., and BROWN, J., concur.

TERRELL, J., concurs in the opinion and judgment.

ELLIS, C. J., and BUFORD, J., dissent.

BUFORD, J. (dissenting).—I think the record fails to show the existence of a common law marriage because it is not sufficiently shown that the parties were competent and qualified to enter into a common law marriage. If either party had a living spouse a common law marriage could not be

consummated. The record showed conclusively that the parties were not husband and wife as the result of a ceremonial marriage. Witness Hurlbert testified that Nathaniel had a wife and child "down the State." If this was true he was not competent to effect a common law marriage with Daisy Orr.

ELLIS, C. J., concurs.