## Commonwealth v. Amann

Before McCann, P. J., McKendrick and Griffith, JJ.
*Frank P. Barnhart,* for Commonwealth.
*Marlin B. Stephens,* for defendant.

GRIFFITH, J., March 11, 1947.—An information was made against defendant by prosecutrix under the provisions of the Act of June 24, 1939, P. L. 872, sec. 733, 18 PS §4733, charging him with the failure to support prosecutrix, his lawful wife, and their infant child.

Defendant contends that prosecutrix is not his lawful wife, and consequently, not entitled to support. Prosecutrix set up a common-law marriage entered into by written agreement in the year 1945 while defendant was in the armed forces and located at Zubic Bay in the Philippine Islands. The testimony shows that a child was born out of wedlock to the parties on May 27, 1945, after defendant was in the military service. Upon learning of the birth of the child, defendant wrote to prosecutrix requesting her to obtain the consent of her parents to their marriage since she was a minor, and also for her to obtain a premarital blood test, in order that they might be married. Accordingly, prosecutrix obtained the written consent of her parents and also the standard premarital form of laboratory report, and forwarded these papers in July 1945 to defendant. Whereupon defendant had a

formal contract of marriage prepared, signed the same, had it witnessed and acknowledged before a commissioned officer, and returned two executed copies to prosecutrix, requesting her to sign and acknowledge and return one copy to him. She received the signed copies of the marriage contract during the month of August 1945 and within a short time signed and acknowledged both copies before the clerk of the orphans' court, and returned one to defendant, as requested by him. Subsequently, defendant wrote her numerous letters, two of which were introduced in evidence, in which he addressed her as his wife and signed himself as her husband.

Upon defendant's discharge from the armed forces in April of 1946 he returned to this country, visited prosecutrix and their child on several occasions, spent several nights with her (although he denies cohabitation), and frequently took her to shows and other entertainment. The father of prosecutrix suggested that it would be well to have a formal ceremony performed, and offered to give defendant a lot of ground upon which to build a home after the performance of such ceremony. Apparently, by this time, defendant's affection, which had been very warmly expressed in his correspondence, began to cool, and he ceased visiting prosecutrix, and has not contributed adequately to the support of either her or her child. As a result of his failure to contribute to their support, she made this information.

The marriage contract, which was offered in evidence, is a specific agreement in præsenti. It contains in particular the following language:

"The parties hereto, desiring to enter into a present agreement of marriage, and mutually consenting each with the other to become husband and wife, do covenant and agree as follows: I, Edward James Amann, do hereby solemnly agree to take Elverta Newell Wil-

kins as my wedded wife, to live together in the holy state of matrimony, to love her, comfort her, honor and keep her, in sickness and in health, and forsaking all others, keep her only, so long as we both do live."

Prosecutrix agreed likewise in identical language.

Defendant contends that because the persons were not in the presence of each other at the time of the execution and acknowledgment of the marriage contract that it is invalid to constitute a marriage. Several cases are cited by defendant (for example, Pierce v. Pierce, 355 Pa. 175) which stand for the rule that in order to constitute a valid common-law marriage contract the words used must be in the present tense and not in the future. Defendant argues that because defendant agreed to the marriage in the Philippine Islands and prosecutrix agreed later in Pennsylvania that the words could not be spoken in the present tense, although they purport to be so spoken.

However, we believe that the signing of the marriage contract presently agreeing to marriage on the part of defendant and his forwarding that contract to prosecutrix constitute a continuing offer subject to acceptance by his intended wife. Upon receiving this contract, she accepted the offer by formally executing and acknowledging it and returning a copy to defendant. This, we believe, constituted a binding contract of marriage.

"It has been observed that the modern trend is toward consideration of marriage as a business transaction, the rights of the parties to which are to be determined by general principles of the law of contract": 35 Am. Jur. 183, §5.

There is conflict concerning the necessity of the presence of the contracting parties at the time the marriage is performed. The rule has been stated that to constitute marriage per verba de præsenti the parties must be in the presence of each other when the agreement is entered into: Orr v. State, 129 Fla. 398, 176 So. 510.

On the other hand, there are authorities for the view that it is not necessary for the parties to be in the presence of each other at the time of entering into a marriage contract: 35 Am. Jur. 194, §22:

"In our American states, where mere consent of the parties constitutes a marriage, generally called a common-law marriage, it would seem, following the rule of the Roman Law, that the presence of the man is not requisite": Burdick, Principles of Roman Law, 277.

In Ex Parte Suzanna, 295 Fed. 713, the United States District Court of Massachusetts found that the marriage of a Portuguese woman resident in Portugal, who had married by proxy a man domiciled in Pennsylvania, was valid. In that case, the court said in part (p. 716):

"But is there any reason of public policy why the contract itself should require any different formalities than any other contract? Does the mere presence of the parties at the time of the making of the contract add any essential element to the agreement between them? Royal marriages celebrated by proxy have long been considered true marriages. Queen Mary of England married Philip the Second of Spain before Bishop Gardiner, the Spanish monarch being represented at the ceremony by Count Egmont . . ., and there are records of other such marriages. . . . We have already noticed the marriage by proxy of Balboa; and the custom is said to have been common during the Middle Ages in Europe. 32 Harv. L. Rev. 477. If royalty could do it, why may not those of more common clay be allowed to follow their example? There is a very instructive decision in the Eighth Circuit to the effect that marriage, like any other contract, may be effected by correspondence. Great Northern Railway Co. v. Johnson, 254 Fed. 683, 166 C. C. A. 181. See, also, Catholic Encyclopedia, vol. 9, p. 702."

This question is also covered by A. L. I. Restatement of Conflict of Laws, §125, which reads as follows:

"A marriage by means of mutual consent given by letter or by other means of securing consent between persons in different places is valid everywhere if it is valid by the law of the state from which the acceptance is dispatched." To the same effect was the Great Northern Railway Co. v. Johnson, supra.

"Where the correspondence crosses state lines, the validity of the marriage is determined by the law of the state where the acceptance is mailed": 1 Freedman on Marriage and Divorce, §12.

This question must be decided in accordance with the law of the Commonwealth of Pennsylvania. In this State common-law marriages are valid, and there is nothing in the law of Pennsylvania which has been brought to the attention of the court which requires the presence of both parties at the time of the marriage.

There is some dispute as to whether or not this marriage was consummated by cohabitation after the date of the marriage contract. However, if a valid marriage was entered into, as we believe, a consummation by cohabitation is not required. Cohabitation is not a requisite of marriage. The fact is that cohabitation is frequently used to prove marriage, but its absence does not disprove a marriage otherwise shown to have been effected.

"Marriage is a civil contract *jure gentium*, to the validity of which the consent of parties, able to contract, is all that is required by natural or public law. If the contract is made *per verba de prosenti*, though it is not consummated by cohabitation, or if it be made *per verba de futuro*, and be followed by consummation, it amounts to a valid marriage in the absence of all civil regulations to the contrary: . . ." Richard v. Brehm, 73 Pa. 140, 144.

We, therefore, believe that a marriage by correspondence is valid in Pennsylvania, and that prosecutrix is the lawful wife of defendant.

In view of the fact that defendant's earnings are small, the order for support will necessarily be moderate. However, in the event that his earnings increase, an application can be made by the wife for an increase in the amount of the order.

We, therefore, enter the following

### Decree

Now, March 11, 1947, after argument and upon due consideration, defendant, Edwin James Amann, is found guilty and is directed to pay the sum of $50 per month to the Probation Bureau of Cambria County for the support of his wife, Elverta Wilkins Amann, and his child, Larry James Amann.