237 So.2d 776 (1970)
Dorothy WILLIAMS, Appellant,
v.
DADE COUNTY, Florida, E. Wilson Purdy, Sheriff of Dade County, Florida, James Cribbs and James Laurie, Appellees.
No. 69-684.
District Court of Appeal of Florida, Third District.
July 14, 1970.
*777 Horton & Schwartz, Granat, Rosenblatt & Roemer, Miami, for appellant.
Knight, Underwood, Peters, Hoeveler & Pickle, Dixon, Bradford, Williams, McKay & Kimbrell and Roy S. Wood, Jr., Miami, for appellees.
Before PEARSON, C.J., and CARROLL and SWANN, JJ.
PEARSON, Chief Judge.
The appellant, Dorothy Williams, brought an action for the wrongful death of Johnnie Lee Williams. She claimed to be his wife by virtue of a common-law marriage.[1] The complaint claimed that Johnnie Lee Williams had been killed by the negligent act of police officers acting within the scope of their employment by the county. At the conclusion of all the evidence, the trial judge directed a verdict for all the defendants. This appeal is by the plaintiff from the judgment entered upon the directed verdict. We affirm.
The only grounds argued in the trial court or in this court which could have formed the basis for the directed verdict for all the defendants[2] are: (a) there was no showing of any actionable negligence or misconduct on the part of the defendant officers; (b) the plaintiff had no standing to sue because the evidence did not reasonably support the view that she was decedent's widow. In examining each of the grounds appellees have presented for affirmance, we shall be governed by the principles that directed verdicts should be cautiously granted and will not be sustained unless the record when viewed in the light most favorable to the party against whom the motion is directed fails to show any reasonable view of the evidence which could sustain the position of that party. Bourgeois v. Dade County, Fla. 1957, 99 So.2d 575. Viewed in this light there was a triable issue as to the alleged negligence of the police officer who shot the decedent. Although there is evidence to the contrary, a jury of reasonable men could find that Johnnie Lee Williams had been shot in the back when he did not have a weapon at hand and while there was no riot or affray in progress.
A detailed review of the evidence is necessary for deciding the question whether the record presents a basis upon which the jury could have found that the plaintiff-appellant, Dorothy Williams, was the common-law wife of the deceased. That review may be summarized as follows:
1. Appellant married the deceased in a ceremonial marriage in May 1955.
2. The deceased and a second woman, Lillian Williams, went through a marriage ceremony in August 1957.
3. The deceased lived with each woman intermittently until 1962. During that time he had children by each woman. Sherrie, by appellant in 1957; Johnnie, by Lillian in 1958; Barry, by appellant in 1959; *778 twins Donnie and Tyrone, by Lillian in 1959.
4. Appellant divorced the deceased in 1962.
5. While the divorce proceedings were pending, appellant and deceased "had an affair".
6. Appellant felt that the divorce did not mean a thing.
7. After the divorce the deceased lived with the appellant for a few months.
8. Later in 1962 the deceased left the appellant, who petitioned the circuit court for enforcement of the support provisions of the decree of divorce.
9. In 1963, the deceased began living with a third woman, Mozelle Pollard.
10. Appellant applied for and received welfare payments for herself and her children in 1963. In her application she told the state that she was a divorced woman and did not know where her former husband lived.
11. In 1964 the deceased separated from Lillian Williams, but he went back to her from time to time.
12. From 1963 to 1967 appellant lived with the deceased "off and on".
13. In 1965 a welfare case worker contacted the deceased, who reported that he was not living with the appellant.
14. In 1965 appellant reported to a welfare case worker that the deceased was her ex-husband and that she received no support from him.
15. In 1967 appellant entered a welfare educational program, listing herself as the head of a family without a husband.
16. In March 1967 the deceased returned to live with appellant, but because she did not want to lose her welfare she made him take an apartment at another place. This subterfuge continued until the death of the deceased in August 1968.
17. The deceased lived with Mozelle Pollard regularly until May 1967 and thereafter he lived with her periodically.
18. The appellant completed her training program under welfare and applied for work with the Southern Bell Telephone Company. At her employment interview she made no mention of a husband, and upon her employment forms she listed herself as a divorced woman.
19. From 1965 until June of 1968 appellant represented to welfare that she had no husband.
20. In her dealings with welfare in 1967 she referred to Mozelle Pollard as the common-law wife of the deceased.
21. The deceased maintained a residence separate from the appellant at the time of his death, and on the forms filed by the appellant for insurance benefits she listed the deceased as residing at a separate address.
The foregoing evidence reveals that the deceased lived with several women alternately so that two or more regarded him as "husband" at the same time. Although a divorce in 1962 ended the marriage the deceased and the appellant entered into ceremonially, the appellant contends that "no one really knew about this divorce" and that the divorce effected no change in her relationship with the deceased:
"* * * like he always told me this thousands of times, that divorce didn't mean anything. He was still my husband. I always told him I was still his wife and that was it."
She concludes that a common-law marriage between her and the decedent existed at the time of the decedent's death. There are two separate cohabitations upon which the appellant relies as the possible beginnings of a common-law marriage. The first is in 1962 immediately after the divorce. The second is in 1967 at about the time of the termination of decedent's relationship with Mozelle Pollard. Each of these relationships *779 with the plaintiff must be examined to see if the evidence establishes a prima facie case of a common-law marriage at that time because if a valid common-law marriage came into existence after the divorce, it could only have been dissolved by a second divorce or death. Catlett v. Chestnut, 107 Fla. 498, 146 So. 241, 247, 91 A.L.R. 212 (1933).
A common-law marriage must be established by words of present assent:
"In the case of Marsicano v. Marsicano, 79 Fla. 278, 84 So. 156, this Court held that to constitute a valid marriage, per verba de praesenti, there must be an agreement to become husband and wife immediately from the time when the mutual consent is given.
"In the case of In re Price's Estate, 129 Fla. 467, 176 So. 492, 493, we held that `neither cohabitation and repute nor circumstances, whose sole function is to show mutual consent of the parties, establishes a common-law marriage of itself. There must be words of present assent per verba de praesenti.'" Carretta v. Carretta, Fla. 1952, 58 So.2d 439, 441.
The only portions of the record that could possibly show an exchange of words of present assent in 1962 are the emphasized words in the following excerpt from the appellant's testimony:
"* * * While I was in the process of setting the divorce, we had an affair. He never left me alone.
Q That was my next question. After the divorce, after the actual divorce, was there any change in your relationship?
A Well, no. You know, for maybe about a month, and then  like he always told me this thousands of times, that divorce didn't mean anything. He was still my husband. I always told him I was still his wife, and that was it.

Q Was this something that he said to you and that you said to him after the divorce?
MR. HOEVELER: Excuse me. I would object, your Honor, to hearsay, and move to strike the hearsay that has been proffered.
THE COURT: What she might have said might make some difference, but what he said to her 
MR. ROSENBLATT: It goes to one of the issues, your Honor.
THE COURT: Sustained."
* * * * * *
"THE WITNESS: He stayed there that very night. Johnnie slept in our house that very night.
Q (By Mr. Rosenblatt) When was this night in relation to the divorce?
A The divorce hearing was this date, and I called him.
Q The Judge has ruled that you cannot tell us what Johnnie said to you. You say that he stayed there that night?
A He stayed there that night.
Q The day you got the divorce?
A That's right. We talked. He said it meant nothing to him.

Q Don't tell us what Johnnie said. You can tell us what you said to him.
A I told him about the divorce. I told him it really meant nothing * * *."
We note that the words purportedly spoken by the deceased were stricken upon motion, but even if they had not been stricken we would hold them insufficient to show a present intention at a particular time to establish a new marriage. Even if the deceased and the appellant did tell each other that the divorce meant nothing to them and that they were still husband and wife, they did not speak words of present assent to a marriage beginning that night. The only meaning that may be attached to the exchange is that the two agreed to continue a past relationship and to disregard the legal effect of the divorce rather than to enter *780 a new marriage beginning on that night. The testimony shows no attempt to initiate a marriage. Instead it shows conclusively an attempt to continue a marriage that had been dissolved by law, an attempt frustrated by logical impossibility. Compare In re Price's Estate, 129 Fla. 467, 176 So. 492 (1937), and Jordan v. Jordan, Fla. 1956, 89 So.2d 22 (common-law marriage not established), with Orr v. State, 129 Fla. 398, 176 So. 510 (1937); In re Colson's Estate, Fla. 1954, 72 So.2d 57; and Chaachou v. Chaachou, Fla. 1954, 73 So.2d 830 (common-law marriage established). The circumstances of the present case are like those of the first group and unlike those of the latter.
The second period urged by the appellant to be one in which a common-law marriage arose is that following her resumption of the indefinite relationship with the decedent in March 1967. The following segment of the appellant's testimony bears on the question whether the decedent and the appellant exchanged words of present assent in March 1967:
"Q (By Rosenblatt) Just tell us when Johnnie came back to live in 1967, what you said.
A When Johnnie came back to live in March of 1967, we talked, and, you know, he told me he didn't care about, you know, divorce, as far as he was concerned; that I was still his wife; and I said that he was still my husband.

Q And that conversation would have taken place in March of '67?
A Yes. And then he discussed it and wanted to make a go of it, and rear his children. They were big children. They loved him, and he wanted to be with us."
It will be observed first that the dialogue appellant alleged she had with the decedent in 1967 is substantially identical with that of 1962. It therefore suffers from the same infirmities. It will be observed next that this was not an isolated instance because appellant also testified that: "I can't say how often, how many times [appellant and deceased were together under the same roof between 1963 and 1967], but we did live together off and on." During one of the "off" periods the deceased picked up a new "wife", Mozelle Pollard. She alleges that the decedent lived with her until May 3, 1967. The relationship that appellant and decedent resumed in March 1967 was the same relationship that had existed earlier. It was a temporary, not a pemanent relationship. The decedent was a night visitor who maintained a separate abode from the appellant; he was therefore not appellant's husband.
"To cohabit as man and wife means to live together, to have the same habitation, so that, where one lives, there will the other live also. It does not contemplate a mere sojourn, visit, or living together for a time. Proof of general repute cannot be supported by hearsay. It must be established by positive proof that it was generally understood among the neighbors and acquaintances with whom the parties associate in their daily life that they are living together as man and wife, and that their relations are not meretricious. Proof of clandestine or concubinage relations will rebut the presumption of marriage." LeBlanc v. Yawn, 99 Fla. 328, 126 So. 789, 790 (1930).
The best that can be said for the entire post-divorce relationship is that the appellant and decedent attempted to effect a common-law marriage by keeping their divorce a secret. But a secret common-law marriage is a logical impossibility. Catlett v. Chestnut, 107 Fla. 498, 146 So.2d 241, 91 A.L.R. 212 (1933). If a divorce is kept secret subsequent cohabitation of the parties does not ripen into a marriage without a new agreement to become husband and wife. Harrington v. Miller, Fla.App. 1960, 123 So.2d 736. We conclude that the trial *781 judge correctly determined that the evidence as a whole viewed in the light most favorable to the appellant does not establish the proposition that the appellant was the widow of the deceased.
Appellee Dade County and appellee Purdy have asserted additional and separate grounds for affirmance in their favor. Dade County, despite the provisions of § 455.06, Fla. Stat., F.S.A., relies upon the defense of sovereign immunity from liability. Appellee Purdy relies upon his assertion that the record supports a holding that the sheriff is not liable for the acts of the deputy because the acts constituted a usurpation of power. We do not pass upon these arguments in view of our holding concerning appellant's lack of standing to bring this action.
Appellee James Laurie urges that the directed verdict was proper upon his motion because the evidence shows no issue as to any act of his which resulted in harm to the deceased. Appellee Laurie and appellee Cribbs derived their authority and compensation from the same source, worked under the same control, and were engaged in the same occupation. They were therefore fellow-servants. Sutton v. Hancock, 105 Fla. 497, 141 So. 532 (1932). It is uncontroverted that Laurie was armed with a revolver and that the deceased was killed by a shotgun. Since the negligence of one servant may not be imputed to a fellow-servant (Georgia Southern & Florida Railway Co. v. Shiver, Fla.App. 1965, 172 So.2d 639, 642), it is clear that the record fails to disclose any evidence which would furnish a basis for Laurie's alleged liability.
Inasmuch as the affirmance of the final judgment is based upon a holding that the appellant lacked the capacity to sue, it should be noted that § 768.02, Fla. Stat., F.S.A., provides the proper parties plaintiff for an action like the present one.
Affirmed.
NOTES
[1] Common law marriages are recognized in this state if their inception is prior to January 1, 1968. See § 741.211, Fla. Stat., F.S.A. which provides:

"Common law marriages void.  No common law marriage entered into after January 1, 1968, shall be valid, except that nothing contained in this section shall affect any marriage which, though otherwise defective, was entered into by the party asserting such marriage in good faith and in substantial compliance with this Chapter."
[2] Three defendants have argued one or more grounds claimed to be applicable to each of them. These grounds will be briefly discussed later.